[No. 28681.   Department Two.   July 22, 1942.]

EVELYN TAYLOR, *Appellant,* v. CHARLES TAYLOR, *Respondent.*[1]

*Marion Garland, Sr.,* and *Marion Garland, Jr.,* for appellant.

*Helen Graham,* for respondent.

JEFFERS, ·J.—This is an appeal by Evelyn Taylor from an interlocutory decree of divorce entered November 17, 1941.   By the decree, Charles Taylor, the husband, was granted the custody and control of the two minor children, Douglas, age five years, and

[1]Reported in 126 P. (2d) 855.

Dannie, age three. Mr. Taylor was also awarded the home and an automobile, and was required to pay all community debts and also to pay Mrs. Taylor six hundred dollars in cash. Mrs. Taylor was awarded certain personal property, which she now has in her possession in Seattle.

This controversy really involves two proceedings. On July 10, 1941, Mrs. Taylor started an action for divorce against her husband, in the superior court for Kitsap county. The substance of the allegations of her complaint is that Mr. Taylor for two years had, by numerous acts and words, made the home life of plaintiff burdensome. Mr. Taylor, in his answer to the complaint, denied the allegations of the complaint, and denied that plaintiff had any grounds for a divorce, affirmatively stating that the antagonism of his wife had no real basis, and suggesting that she be given a decree of separate maintenance, during which time he would remain away from her, and would comply with any order of the court relative to providing for the support of his wife and children.

The matter came on for hearing before the court on August 4, 1941, at which time some six or seven witnesses testified for and on behalf of each of the parties. At least three of plaintiff's witnesses were relatives, the other witnesses of plaintiff and all of defendant's witnesses, with possibly one exception, being close personal friends of both Mr. and Mrs. Taylor. The testimony may be summed up in the words of the trial court, found in its memorandum opinion filed at the close of the second hearing, which occurred October 28, 1941:

"In summing up the case the court at that time [the first hearing] found there was little grounds for divorce. The only claim of misconduct on the part of Mr. Taylor was that he, before members of her family,

took liberties that should only be in the privacy of one's bedroom. The only persons who testified to this were relatives, with one exception; that was a Mrs. Gloria Dunn, who likewise by the way was a cousin of the plaintiff. The defendant Mr. Taylor called numerous witnesses, men and women with whom the Taylors had traveled during their residence here, and they all insisted that they had never seen any misconduct of any kind on the part of Mr. Taylor, that they thought the family were happy and getting along beautifully."

It may be added that no acts of immorality on the part of either plaintiff or defendant were testified to by any of the witnesses.

At the close of the first hearing, the court entered a decree of separate maintenance to Mrs. Taylor for the period of one year, gave her the custody and control of the children, with the right of visitation to Mr. Taylor, awarded to Mrs. Taylor the use of the home, and required Mr. Taylor to pay sixty dollars a month for the support of Mrs. Taylor and the children. This order, while not entered until later, was made about August 4, 1941.

The theory of the trial court in entering a decree of separate maintenance also appears from the following statement found in the memorandum opinion:

"However, because Mrs. Taylor was so insistent that she was absolutely through, that she had had all the man she wanted, the court saw no reason in denying a divorce, or rather denying a separation, but I said I would not grant a divorce for one year, merely granting separate maintenance, to be sure that for a year and a half at least she would be safe from remarriage. . . . In other words, their whole separation was granted and arrangements provided in accordance with Mrs. Taylor's wish so that she could live at peace away from men in her home in or near Port Orchard, having her own aunt care for the children, and with her work and what Mr. Taylor was ordered to provide they could

get along beautifully. This was all in accordance with Mrs. Taylor's expressed wish."

We now come to the second chapter of this unfortunate domestic history. On or about September 17, 1941, defendant filed in the original proceedings what is termed a "petition and amended answer," wherein Mr. Taylor alleged, among other things, that, immediately following the rendition of the decree of August 4th, Mrs. Taylor "embarked on a course of constant running around with one Clifford Maloney, a married man, who was then living with his own wife." The amended answer then sets out many times and places where Mrs. Taylor and Maloney had been together. It is further alleged that Mrs. Taylor has neglected her children to be in the company of Maloney; that, when defendant would go to visit his children in the evening, he would find his wife gone, or, if she was at home, Maloney was there also; that his wife sent the children to Seattle with Maloney, and informed defendant that she was going to live in Seattle, where she had moved much of the furniture. In this amended answer, Mr. Taylor asked for a decree of divorce and custody of the children.

This matter came on for hearing October 28, 1941, before the same judge who had heard the previous divorce proceeding. Again witnesses were called, some of them being the same ones who had testified at the previous hearing. The testimony was directed primarily to the relations of Mrs. Taylor and Mr. Maloney since the entry of the decree of separate maintenance.

It appears from this testimony, without contradiction, that, since about August 4th, Mrs. Taylor and Mr. Maloney had been on very friendly terms and much in each other's company. They both frankly admit this, Mr. Maloney testifying that he had seen her al-

most every night. It further appears that he had taken her riding and to shows, and several times to Yakima, where Mrs. Taylor's mother resides. Both of these parties deny that there has been any improper conduct on the part of either, and there is no direct testimony of any improper relations, unless it can be said that, under the circumstances, the continued association of these parties was improper. The testimony does show that Mr. Maloney was a very frequent visitor at Mrs. Taylor's home, where he was seen at almost any time of the day or night.

Mr. Taylor testified to seeing his wife and Mr. Maloney in a parked car after a dance, at which time Mr. Taylor testified they were drinking and Mr. Maloney had his arm around Mrs. Taylor. Both Mr. Maloney and Mrs. Taylor denied that she was drinking, and denied that Mr. Maloney had his arm around her. It also appears that Mrs. Taylor's aunt was in the car at the time.

While Mrs. Taylor has taken the children and most of the furniture and moved to Seattle, it appears that she asked her attorney if it would be proper to make this move, and was informed there was nothing in the decree prohibiting it.

It further appears that Mr. Maloney left for Alaska shortly before the second hearing, leaving his car with Mrs. Taylor. It also appears that Mr. Maloney had separated from his wife shortly before he began going around with Mrs. Taylor.

The witnesses, almost without exception, testified that both Mr. and Mrs. Taylor were fit and proper persons to have the care and custody of the minor children. The chief complaint of Mrs. Taylor at this hearing was that Mr. Taylor had made unusual and unreasonable sex demands upon her. Mrs. Taylor has been working and hiring some person to look after

the children in her absence, and Mr. Taylor testified that, if the children are awarded to him, his sister will come and live with him, and keep house and look after them. It may also be stated that even Mrs. Taylor's witnesses, including her relatives, testified that Mr. Taylor was a good father, and loved his children.

On this record, the trial court entered the interlocutory decree of divorce hereinbefore referred to, from which Mrs. Taylor has appealed.

Again referring to the memorandum opinion, and quoting from the paragraph following the last quotation, *supra,* we get the trial court's view of the acts of appellant:

"In spite of this, she leaves the home, breaks up the family situation, goes to Seattle within a very short time after the hearing. Within a week after the hearing she is found constantly in association and companionship with this fellow Maloney, who is a married man and, as far as the record discloses, just recently separated from his wife. From that time to the present, or until he left for Alaska, she has constantly continued in his company. He has taken her on three trips to Yakima and taken her to shows. She uses his car indiscriminately; and now that he has gone to Alaska, he has left the car for her use.

"I am convinced that she does not possess the stable qualities that these two boys are entitled to in a mother."

Appellant makes two assignments of error:

"(1) The court erred in awarding the custody of the children to the respondent.

"(2) The court erred in awarding the real property to the respondent."

The basis of appellant's argument in support of her first assignment of error is that, inasmuch as it does not appear that she is morally unfit to have the care and custody of her boys, and it appearing

that they are of tender age, the court should have followed the rule laid down by this court in *Prothero v. Prothero,* 137 Wash. 349, 242 Pac. 1, and awarded the care and custody of the boys to appellant. In addition to the *Prothero* case, appellant cites *Mason v. Mason,* 163 Wash. 539, 1 P. (2d) 885; *Ostrander v. Ostrander,* 176 Wash. 669, 30 P. (2d) 658; *Phelps v. Phelps,* 2 Wn. (2d) 272, 97 P. (2d) 1080; and *Eliason v. Eliason,* 10 Wn. (2d) 719, 118 P. (2d) 170.

In the *Prothero* case, *supra,* we stated:

"Before children of the tender age of those here to be considered are to be taken from the mother and given to others, it should be shown clearly that the mother is an unfit and improper person to be intrusted with their custody. [Citing and quoting from *Free-land v. Freeland,* 92 Wash. 482, 159 Pac. 698.]"

There is no question but that the above rule has been followed in this state, where the facts justified it, and especially has this court been charitable in passing judgments upon the acts of a mother, where it is sought to take her children from her and place them with some person other than the father, as in the *Prothero* case, *supra,* where the lower court had taken the children from the mother and placed them with the mother and father of the husband, and in the *Mason* case, *supra,* where the child was placed in the custody of the mother and father of the wife, and part of the time with the mother of the father.

*Phelps v. Phelps, supra,* cited by appellant, while stating the rule announced in the *Prothero* case, decided no issue of fact, but reversed the case and remanded it with instructions to the trial court to make findings on certain issues.

We have universally held that, in such cases, the welfare of the children is the paramount issue (*Ayers v. Ayers,* 188 Wash. 540, 62 P. (2d) 1358, and cases

cited), and that each case must depend upon its own facts.

In the very recent case of *Eliason v. Eliason, supra,* wherein the trial court refused to give to the mother the custody of a child of tender years, we specifically stated the mother was not shown to have been guilty of immoral conduct, and we there stated:

"Furthermore, in cases of *Burke v. Burke,* 153 Wash. 97, 279 Pac. 87, and *Broesch v. Broesch,* 159 Wash. 409, 293 Pac. 464, this court has, while not in any way disregarding the rule for which appellant contends [the same rule contended for by appellant herein and same cases cited], modified it in special cases in order to give precedence to the rule that the paramount consideration of the courts is the welfare of the child.

"In cases of this nature, we give great weight to the conclusions of the trial court. Consequently, its finding will not be changed unless an abuse of discretion patently appears."

We think a statement made by this court in the case of *Burke v. Burke,* 153 Wash. 97, 279 Pac. 87, wherein the three minor daughters were placed in the custody and control of the father, rather than the mother, is especially applicable here:

"It is quite unusual in these cases to find all of the children, especially when they are all daughters, awarded to the father, but this is an unusual case. The mother was not charged with immorality, nor does the proof lead to any inference of immoral conduct upon her part, and yet the trial judge, who seems to have been deeply impressed with his responsibility, was convinced, after seeing and hearing the witnesses, that the wife's mental attitude toward her husband and toward another was such as to call for the result reached."

We affirmed the judgment.

[2] In the instant case, the parties were before the court not once, but twice, and several of the same wit-

nesses were before the court on both occasions. Surely if a trial court ever had an opportunity to judge which parent would be the most suitable to have the care and custody of children, the court in this case had that opportunity. We are of the opinion that in this case the trial court was convinced that the welfare of these children would be best served, at least for the present, by placing them in the custody of their father, and we are unable to say, from an examination of the record, that the court abused the discretion vested in it, regardless of the fact that he frankly stated that the testimony did not show any immoral conduct on the part of appellant.

We are also of the opinion that the court did not err in awarding the home to respondent. Appellant had left the home, taking with her to Seattle most of the household goods, including a refrigerator, mangle, washer, roaster, mixmaster, iron, toaster, percolator, radio, two chests of drawers, two baby beds, one rug, one set of china, one set of silver, linen, bedding, cooking utensils, of the value of at least five hundred dollars. These articles the court awarded to appellant, and in addition respondent was required to pay appellant the sum of six hundred dollars, in monthly installments of twenty-five dollars or more. Respondent was also required to pay the following community debts: Note, $178.89; Sears, Roebuck & Company, $90; pump and water system, $100; personal loan, $380; doctors' bills, $63.

The judgment of the trial court is affirmed.

ROBINSON, C. J., BEALS, BLAKE, and MILLARD, JJ., concur.