[No. 29422. Department Two. February 2, 1945.]

FRANCIS F. LINDBLOM, *Respondent*, v. ELEANOR E. LINDBLOM, *Appellant*.[1]

*Simmons & McCann,* for appellant.

*Joseph A. Sweeney,* for respondent.

SIMPSON, J.—Plaintiff commenced this action, seeking a divorce from his wife and a decree awarding to him the community property and the exclusive care, custody, and

[1]Reported in 155 P. (2d) 790.

control of their minor children. By cross-complaint, defendant prayed for a judgment and decree awarding her a divorce, the custody of the children, and a division of the community property.

A trial upon the merits resulted in the entry of an interlocutory order, granting a divorce to plaintiff and giving him the care of the children subject to the right of defendant to visit the children at all reasonable times and to have them with her every other week end. The order further provided for a division of the property. Defendant has appealed.

Her principal assignments of error are: (a) in reopening the case for the introduction of evidence after it was once closed; (b) in granting respondent a divorce and refusing a divorce decree in her favor; (c) in awarding the custody of the children to respondent; and (d) in giving to respondent the greater part of the community property.

Appellant first urges error on the part of the trial court in admitting evidence after the trial was once concluded.

The case started January 5, 1944, and continued for some time. When the parties rested, the court announced its conclusions and then stated that a continuance would be granted for sixty days and advised that a reconciliation be brought about if possible. Prior to the expiration of the sixty-day period, respondent filed a motion asking that he be permitted to introduce additional evidence. This motion was opposed by appellant. Affidavits were supplied by both parties. The court granted the motion, and evidence was introduced over the objection of appellant's counsel. We have read the affidavits and the additional evidence, but cannot find that the court abused its discretion in granting the motion and admitting the evidence.

At the second hearing, it developed that the parties had not been able to reconcile their differences.

We set out only that part of the evidence which is absolutely necessary to a decision of this case.

Respondent and appellant were married November 27, 1935. To this union two girls were born, one July 14, 1939,

and the other November 8, 1940. The parties purchased a small tract of land and proceeded to improve it by the building of a small dwelling house and certain outbuildings. They also acquired other property, consisting of household and farming equipment, livestock, and war bonds, until at the time of the trial they had property of the approximate value of ten thousand dollars. The property was acquired by hard work and frugal living on the part of both.

A considerable time before the beginning of this action, appellant became interested in a man who had been a neighbor and friend of the family. She also carried on a romantic correspondence with another man. In September, 1942, appellant, tiring of her life on the farm, decided, contrary to the wishes of respondent, to work in a plant devoted to war work, where she could receive a large wage. At that time, she made arrangements to leave the children with the paternal grandmother, who lived on an adjoining farm. At first, the children were returned home every evening, then on week ends, and eventually they were left with the grandmother all of the time. Finally, appellant told her husband that she had ceased to love him.

Appellant's evidence tended to prove that the family difficulties arose over interference by her mother-in-law and a cold and indifferent attitude on the part of respondent.

A reading of the record satisfies us that respondent maintained the burden of proof and that the trial court was correct in granting a divorce to respondent.

The most important question in this case arises over the disposition of the children. As has been stated, the children were given to respondent. When he secured their custody, he placed them in the care of his mother, where they have had excellent care.

It is settled law of this state that, in cases of this nature, the welfare of the children is of paramount consideration, *Taylor v. Taylor*, 14 Wn. (2d) 293, 126 P. (2d) 855; and that a mother shall not be deprived of the custody of her children "unless it is clearly shown that she is so far an unfit and improper person that her custody of them will

endanger their welfare." *Phelps v. Phelps,* 2 Wn. (2d) 272, 97 P. (2d) 1080.

The showing relative to the care given the children by appellant is best shown by the evidence given by two neighbors, Mrs. Solver and Mrs. Hurd. Mrs. Solver testified:

"Q. Just state, Mrs. Solver, what condition you found it in with reference to cleanliness. A. There was dirty dishes all over, food laying around, and dirty clothes. I don't know if the beds were ever made or not because the door was never open to the bedroom, but I know the rest of it was terrible. Q. What kind of dirty clothes would you find? A. Oh, there was her clothes, and the childrens' clothes . . . Q. What kind of clothes would they be? A. Childrens' diapers, and her underclothes, and stockings, and things like that. Q. Where would the diapers be? A. Oh, practically anywhere. Q. Would you find them on the furniture? A. Oh, yes. Q. What furniture would they be on? A. The davenport, or chair, or hi-chair, or bassinette, or anything. Q. What was the condition of the kitchen? A. Well, it was just a mess, that's all I can say. Q. Did you ever speak to Mrs. Lindblom about the condition of her home? A. Oh, no, that wasn't any of my business. Q. Did you observe the health of the children? A. Yes, they had colds all the time. Q. Did you have an opportunity to observe whether or not they were properly clothed? A. Oh, yes, I told her many times she should put clothes on the little girls, it wasn't good for them. Q. How would you find them dressed? A. Without any underclothes, and very little else on, in the coldest weather. Q. How would they be dressed in cold weather when they were outside? A. I don't know about that. They weren't out very much because they generally had a cold, and she did keep them in when they had a cold. Q. What was the condition of the house, warm or cold? A. Well, I didn't think it was very warm, because we are used to a warm house. They only have a cook stove to heat it with, but it is a small house. Q. Would it be warm? A. It should be warm if the fire was kept up. . . . Q. Did she ever talk to you about having to work outside? A. No, she liked it. Q. Did she so state to you? A. Yes, she did. Q. Did she make any objections to you about working inside? A. Well, I don't think so. She didn't work inside. . . . Q. How often would you say that they would have colds over a period of a year? A. Well they had a cold most of the time because the older girl had tonsilitis. Q. How about the younger

one?  A.  I don't think she did, but she had a cold most of the time.  Q.  Was there any other condition about her that was not healthy?  How about her skin?  A.  Well, she had a breaking out quite a bit.  Q.  Whereabouts?  A.  On her little bottom.  .  .  .  Q.  Have you ever observed the condition of the potty, or the baby chair?  A.  Yes, I have  Q.  And was that clean or unclean?  A.  Very unclean.  Q.  In what respect?  A.  Well, it was generally full.  Q.  It wasn't emptied?  A.  No.  Q.  Have you seen the children sitting on that when it was full?  A.  Yes, I have.  Q.  How often?  A.  Oh, I can't say how often, at times when I have been there.  Q.  Did you call Mrs. Lindblom's attention to it?  A.  No.  Q.  Would the children get off while you were there?  A.  Oh, sure, I imagine they did.  I didn't pay particular attention to them.  Q.  How did you observe what its condition was then?  A.  Because it sat by the kitchen stove, you couldn't help but see it.  Q.  It was in the kitchen?  A.  Yes, sir."

The evidence given by Mrs. Hurd is as follows:

"Q.  What was the condition of the potty at that time?  A.  It was full.  It was full of both different kinds of filth, and it looked like she hadn't emptied it for several days.  Q.  Did you have occasion to observe that other times?  A.  Well, I have seen it full of urine, if that is what you are asking for.  Q.  Did Mrs. Lindblom ever discuss the condition of her kitchen with reference to dishes?  A.  Yes, one time she came over to my strawberry patch.  I was out working in the strawberry patch, and my neighbor and I were out there talking, and she came over with the little girl.  When she came over we were talking about our work and what we had to do.  She said 'Well,' she says, 'I have got three sets of dishes,' she says, 'and I never wash them until they are all dirty.'  That is what she said.  Q.  What was her attitude with reference to the clothes of the family?  A.  You mean as far as being dirty is concerned?  Q.  Yes.  A.  Well, as far as being dirty, I would say, she was about the filthiest housekeeper I have ever seen.  Out in the back shed— Mr. Simmons: (interposing) I move to strike that as a conclusion of the witness, Your Honor.  The Court:  It will be overruled.  A. (continuing) Out in the back shed, where she had the washing machine, there were several boxes, probably five or six boxes, regular cartons that were piled up around the wall, two different walls, and they were just really heaped up with dirty clothes and clothes that had become dirty and soiled and she just didn't want to wash

them, I guess, or something. They weren't being used anymore, anyway. Q. Did you have an opportunity to observe whether or not those clothes were worn clothes or old clothes? A. Not all of them were because I remember seeing them on the children just recently and they were in these boxes along with the rest. Q. Did she explain why they were there? A. No, I didn't ask her. It wasn't any of my affair, so I didn't say anything about it."

There was other evidence of like nature given at the trial. Appellant denied the statements made by the witnesses to whom we have just referred and contended that she took good care of her children.

██ A careful consideration of all the evidence convinces us that the welfare of the children would be endangered if they were given into the custody of their mother. It is not necessary to prove moral unfitness on the part of a mother in order to deprive her of the care and custody of her children. Their health and physical well-being must be taken into consideration at all times.

██ Finally, appellant complained about the division of property. The property award made to appellant was as follows:

"Steam iron, pressure cooker, pictures, washing machine, radio, skillets, roaster, maple rocking chair, mahogany chair, arm chair, sewing machine, refrigerator, engagement ring, dressing table and bench, mixing bowl, and knives, together with any cash and bonds in her possession, except any of such bonds made out to the minor children of the parties hereto, and that by reason of the fact that she has worked hard as well as Mr. Lindblom she will be awarded a judgment against the plaintiff in the sum of Eighteen Hundred ($1800.00) Dollars which shall be a lien against the ranch property as security for said judgment and that the judgment may be discharged as the plaintiff sees fit but in any event he must pay at least Thirty-five ($35.00) Dollars per month on this indebtedness or the defendant will have the right to foreclose her lien unless good cause is shown by the plaintiff why such should not be done."

The balance of the property was given to respondent.

We are unable to see any error in the disposition of the property when we take into consideration that respondent

must care for and educate the children and maintain as best he can a home for them where they may be brought up as good American citizens.

At the close of the first hearing the court stated:

"This case has given me great concern. There are far too many divorce cases nowadays, but this case is refreshing in one respect, in that the testimony has not involved the intemperate use of intoxicating liquor and the setting for the testimony has not been a beer parlor, as is true in most of the cases we are called upon to hear.

"I am here faced with a man and woman, both of whom are of very fine appearance. The plaintiff husband has only had an eighth grade education, and his command of the English language is not very good, but he is a young man, well-dressed, clean-cut in appearance, and in spite of the defendant's superior education, her husband is one whom she could introduce to her friends and be proud of him. Likewise, the defendant is a woman of very fine appearance. She is a good-looking woman—a woman well-dressed,—dressed in good taste. I say this for the benefit of any other court who might by chance have to review the record.

"From general appearance and their general make-up, these two people would appear to me to be two who should get along. But they have not. I still entertain the forlorn hope that they may, for this reason: they are both industrious; they are both frugal,—the plaintiff being frugal almost to a fault."

In his final memorandum opinion we find the following statement made by the trial court:

"In spite of all that has been said and done, I am still hopeful that these parties may get together. At the time of the last hearing I had the feeling that Mrs. Lindblom was beginning to weaken and that Mr. Lindblom was less inclined to a reconciliation than he had been sixty days before. I hope that a definite decision of this case may encourage a reconciliation. I had the feeling that the 'more abundant life' which Mrs. Lindblom has been living was becoming less glamorous to her. If so, surely Mr. Lindblom can overlook a lot of things that have happened. The pleasure of having these two children with both parents at all times should bring more happiness to the lives of both Mr. and Mrs. Lindblom than the way in which they are now living."

We concur in what was stated by the trial judge after he had given a most earnest consideration to the situation confronting the parties to this action. Appellant could, if she so desired, learn to take proper care of her children. Two paths were, and are, open to them, one leading to a home with loving children who urgently need the care of father and mother. The end of that path will mean the fulfillment of a duty well done which will bring peace and contentment to all concerned in this case. The other path, along which appellant and respondent are now traveling, will be beset by discord and unrest which will, without doubt, leave an indelible impression of failure upon the father and mother and will unsettle the lives of their children.

Appellant and respondent should reconcile their differences, move to a community far removed from their present home, and begin life anew.

With the hope that a reconciliation may be brought about, we affirm the judgment.

BEALS, C. J., BLAKE, ROBINSON, and MALLERY, JJ., concur.