[No. 29912. Department One. September 14, 1946.]

HELEN R. SCHORNO, *Appellant,* v. WALTER SCHORNO, *Respondent.*[1]

[1]Reported in 172 P. (2d) 474.

*Burkey & Burkey* and *S. J. O'Brien,* for appellant.

*Eisenhower, Hunter & Ramsdell,* for respondent.

BEALS, C. J.—The parties to this action intermarried August 10, 1936. Helen Schorno was then nineteen years of age and her husband, thirty. Mr. Schorno was born in Switzerland, where he was educated at an institution prob- ably the equivalent of an agricultural college. He came to the United States in 1927, and was admitted to citizenship in 1938. The couple operated a dairy farm, where they established their residence, near the town of McKenna. Two children were born, Walter, April 21, 1938, and Albert, August 16, 1939.

Mrs. Schorno having brought a suit for divorce, an inter-locutory order was entered in the action November 21, 1941, awarding Mrs. Schorno a divorce, together with the custody of the children and sixty dollars per month for her and their support. No appeal having been taken by either party, on Mr. Schorno's application, a final decree of divorce was entered June 6, 1942. Mr. Schorno remarried two days after the entry of the final decree, and has one child by his second wife. He has continued to live on the dairy farm, and has very greatly increased its scope, value, and activities.

At the time of the divorce, the parties owned a large dairy farm (respondent now owning six hundred acres) upon which were located the necessary buildings and equipment. They also owned over a hundred head of blooded cattle, including some sixty milch cows, and operated a milk route. Mr. Schorno having testified that he was indebted in an amount exceeding his assets, the trial court, having accepted

his testimony as true, awarded all the property owned by the parties to Mr. Schorno, he agreeing to pay all the community indebtedness. Mrs. Schorno was awarded a few items of personal property, respondent to pay for furniture selected by her up to two hundred dollars in value. The interlocutory order contained the following provisions:

"2. She is hereby awarded the care, custody and control of Walter Schorno and Albert Schorno, minor children of the parties hereto, subject to the right of the defendant to have them with him over the week-end twice a month, beginning with the 6th day of December, 1941, and for one month during the summer, until the children become of school age when he shall have the right to have the children during the school recess periods, except that the plaintiff may have the children on Thanksgiving Day in the even years and on Christmas Day in the odd years. That in the bi-monthly period when the defendant shall have the children, unless he has a conveyance of his own, they may be taken on the return trip of one of the defendant's trucks on Saturday afternoon, and returned to the plaintiff by said truck on the following Monday morning, but that otherwise they shall be returned on Sunday evening in time for their ordinary bedtime, and the plaintiff shall have the children ready to be taken by the defendant at the time herein specified; unless otherwise agreed upon the defendant shall have the children during the month of July. The custody of the children and the rights of the parties hereto shall be subject to the further order of the court. That the plaintiff is not to remove the children from Pierce County without the further order of the court, but shall not be prevented from taking them out of the county temporarily by way of diversion or pleasure. The defendant is ordered to pay to the plaintiff for her support and for the support of said minor children the sum of $60.00 per month, subject to the rights of the court to change said amount, should conditions warrant, and the said amount to be reduced to $35.00 per month during summer vacation while children are with the defendant."

While the parties were living together, both worked diligently on the farm. Mrs. Schorno cooked, often for as many as six men. She also accomplished the family washing and ironing. She sometimes operated a tractor in the harvest field, and, when Mr. Schorno was ill, carried on his milk

route. In addition, of course, she cared for the children, being most of the time without domestic assistance.

The property settlement made by the court left Mrs. Schorno with nothing, and with no chance of obtaining any benefit from any increase in value of the property. Her work and physical labor for five years had been devoted to the benefit of the community, but the interlocutory order deprived her of all possibility of realizing anything as the result of her efforts.

The trial judge who heard the action for divorce had no criticism of Mrs. Schorno's moral character, nor did the court express any doubt in awarding to her the custody of the children. In making the award, the court expressed the thought that appellant should personally care for the children, realizing at the same time that this would prevent her from accepting employment elsewhere.

Mrs. Schorno rented a remodeled, two-car garage near Tacoma, into which she moved with her children, paying twenty dollars a month rental. Finding that this was more than she could afford, she obtained another small house, for which she paid ten dollars a month.

During the month of May, 1942, prior to the entry of the decree of divorce, Mr. Schorno filed in the cause a petition asking that the interlocutory order be modified by awarding custody of the children to him. Mrs. Schorno filed a cross-petition asking for an increase in the monthly allowance. By order entered June 30, 1942, after the entry of the decree of divorce, the trial court modified the order establishing the custody of the children by granting Mr. Schorno their custody during the months of July and August of each year. It may be noted that this order purported to modify the interlocutory order, which had already been merged into the final decree.

After several months in a vain attempt to live and support her two children upon the amount she was receiving from Mr. Schorno, and when, in March, 1943, she was required to vacate the house in which she had lived with her children, she asked Mr. Schorno if he would increase the payments made to her, and upon his refusal asked if the

children could be placed with him temporarily, to which he agreed. Mr. Schorno denied that his custody of the children was to be temporary. She then went to work as an electrician's helper in one of the shipyards, renting quarters at a government housing project. She requested Mr. Schorno to bring the children to her for occasional visits. Much friction having resulted between the parties, Mr. Schorno being extremely unco-operative, September 2, 1944, Mr. Schorno again petitioned for a modification of the decree, and asked that he be awarded permanent custody of the children.

Mrs. Schorno contested the petition, asked for custody of the children and for an increase in the monthly allowance for their support, so that she could leave her position in the shipyard and devote her entire time to her sons. After a hearing held in September, 1944, it appearing that the elder boy had started school at McKenna, the court postponed decision of the matter until the following June. In July, 1945, the matter was again brought to the attention of the court by a petition filed by Mrs. Schorno.

Schorno again petitioned for the custody of the children, and, after an extended hearing, the court entered an order awarding Mr. Schorno the permanent custody of the boys, they to visit their mother three designated days each month, from which order Mrs. Schorno has appealed.

Appellant assigns error upon the modification of the provisions of the interlocutory order to respondent's benefit, upon refusal of the trial court to award to her permanent custody of her children with an adequate allowance, and upon the refusal of the court to allow her reasonable attorneys' fees.

The record shows many disagreements and disputes between the parties to this proceeding, it being evident that respondent was often arbitrary and unreasonable. Respondent contends that appellant showed little maternal interest in her children, and, on the other hand, contends that he and his present wife are devoted to the children and desire their custody. We are convinced that both parties are attached to the children.

An examination of the record discloses that appellant at all times was devoted to her sons and did everything she could to promote their welfare. The amount of the allowance which she received from respondent for her support and that of the children was utterly inadequate, particularly after the breaking out of the war caused greatly increased costs of living. Respondent contended that he could pay no more, and the trial court did not increase the award. Respondent's admitted financial condition as of November, 1944, certainly indicates that either he was extremely fortunate during the previous year or two, or that he was not candid in his testimony at the time of the trial of the divorce action and at later hearings.

It is evident that respondent is an extremely intelligent, efficient, and industrious dairy farmer, for which he, of course, deserves due credit.

Respondent, at the hearing held September 21, 1944, cross-examined as to his financial situation, testified as follows:

"Q. You are evidently making more money now? A. I make more money but I have to pay out more money. The feed is more than doubled in price, and the wages are more than doubled than it was when the divorce came up. I have to pay a hundred and fifty dollars for a man, and furnish the house and give him the lights and the wood free, and a man can hardly ever worked on a farm before. Q. What did you pay in 1941? A. I believe I paid around seventy-five or seventy dollars, and no house, just the board and room, no house. Q. You are today making money? A. Oh, I think I make a little bit if I work for three men myself. Q. Beg pardon? A. I should make some money, if I work for three men myself. Q. How much are you making now? A. I don't know. Q. What are you earning per month? A. I don't know. Q. Do you keep a record? A. No, I don't keep no record. Q. None at all? A. No."

On recross-examination, respondent testified:

"Q. You say you have an accountant that keeps a record? A. Yes, sir. Q. Then he advises you whether you are making money or not? A. Well, he hasn't been out since December. Q. Hasn't been any record kept since December? A. No record that we know, but we make. We know how much

milk we sell, but no other records. Q. How do you make out an income tax report? A. We keep all our checks and we pay every bit by checks. Q. Well, don't you know now—can't you tell this court what you are making per month, or per year? A. No, I don't know. Q. You don't know at all? A. I don't know at all. Q. But you know you are making money? A. Well, I should make a little bit of money. Q. But you claim at the time this divorce was granted you were not making any money at all. A. No, I never made any money, and I don't think there is anyone in this town that has to hire help that made money those years. MR. RAMSDELL: There is no question but you were in a better financial condition now than you were in 1941 at the trial of this case. A. Yes. Q. How much of that debt that you claimed you owed at that time have you paid off? A. I paid every bit off to the Puget Sound National Bank. They took my mortgage. You can ask the Puget Sound National Bank."

At the hearing in November, 1944, respondent was still vague as to his earnings, and it is impossible to believe that a man as intelligent as he along other lines could know as little as he claimed he knew of his financial status; but, pursuant to a subpoena, the cashier of respondent's bank produced certain records concerning respondent's dealings with the bank, including a financial statement respondent prepared for his bank June 7, 1944, showing respondent's net worth to be over $82,000, out of a gross worth of over $106,000. After the introduction of this evidence, respondent's counsel in open court stipulated that his client was worth, net, in excess of $50,000. From the evidence, it appears that his financial situation continued to improve up to the time of the entry of the order appealed from.

It clearly appears that respondent's counsel endeavored to assist the court in obtaining a correct understanding of respondent's finances.

■ Mrs. Schorno was awarded the custody of her children by the interlocutory order entered in her divorce suit, which was duly confirmed by the final decree. While, in fact, there were some subsequent modifications due to unusual conditions, appellant was legal custodian of her children up to the date of the entry of the order appealed from. Under these circumstances, the burden of showing that the

*status quo* should be changed rests upon the party desiring the change. It must appear that new conditions have arisen since the entry of the last order fixing custody of the minors which require a new adjustment. *White v. White,* 24 Wn. (2d) 52, 163 P. (2d) 137; 17 Am. Jur. 518, 534, §§ 684, 703.

In the case at bar, there can be no question but that the conditions surrounding appellant and respondent, particularly as to finances, have greatly changed. Of course, that fact of itself does not require any change in the custody of the children. *Jones v. Jones,* 23 Wn. (2d) 657, 161 P. (2d) 890. The situation stated may be briefly summarized as follows:

From the record, it appears that each party is a fit and proper person to have custody of the children. Respondent's financial position has very greatly improved since the entry of the decree of divorce, and, due to respondent's lack of candor while testifying at the various hearings before the court, we would be justified in assuming his financial worth at the time of the hearing to be the highest estimate placed thereon by appellant. While we shall not proceed upon this basis, the record shows that respondent's net worth during the years 1944 and 1945 was over $80,000. His ability, industry, and frugality have been amply rewarded.

Appellant has also demonstrated her love for her children, her industry, and her ability as a manager. After the divorce, she had practically nothing. That she was able to live and support her two children upon her available resources certainly indicates careful and efficient management on her part as well as her devotion to her children. When circumstances required that she go to work, she obtained a position, and, by her own efforts, has purchased, in the town of Milton, a home containing a living room, two bedrooms, kitchen, and shower bath, which she purchased on contract for $2,450, paying over half of that amount in cash and making payments on the balance at the rate of forty dollars a month. Appellant was still working at the time of the hearing, but stated that, if the custody of her children is awarded to her, she will give up her position and live with, and care for, them, provided that respondent is directed to pay an ade-

quate sum, at least $150 a month, for the support of the family.

█ In such cases as this, there are three major elements which are always accorded great weight: First, in all cases, the welfare of the child or children concerned is the primary consideration; second, that, in awarding the custody of young children, the mother, if she desires the custody of her children, unless morally or physically unfit, is generally given such custody for reasons which we have repeatedly stated; third, this court, in considering appeals from orders such as is now before us, accords great weight to the decision of the trial court which had the benefit of hearing the witnesses, in most cases, of seeing the children in question, and of obtaining a general trial atmosphere, none of which advantages this court enjoys.

All the principles above stated are, however, subject to the rule that each case must be determined upon its own peculiar facts. *Taylor v. Taylor,* 14 Wn. (2d) 293, 126 P. (2d) 855; *Maley v. Maley,* 18 Wn. (2d) 766, 140 P. (2d) 262; *Myers v. Myers,* 21 Wn. (2d) 19, 149 P. (2d) 926; *Bornstine v. Bornstine,* 21 Wn. (2d) 104, 150 P. (2d) 60; *In re Hansen,* 21 Wn. (2d) 695, 152 P. (2d) 712; *Pardee v. Pardee,* 21 Wn. (2d) 25, 149 P. (2d) 522; *Lindblom v. Lindblom,* 22 Wn. (2d) 291, 155 P. (2d) 790; *Hathaway v. Hathaway,* 23 Wn. (2d) 237, 160 P. (2d) 632; *Mitchell v. Mitchell,* 24 Wn. (2d) 701, 166 P. (2d) 938; *Bornstine v. Bornstine,* 25 Wn. (2d) 57, 168 P. (2d) 147.

The trial judge stated he was convinced that both parents had great affection for their children, and that, while under their mother's custody, the children received good care. The court was also of the opinion that "the welfare of the children is better safeguarded by leaving them with their father." The court was influenced to some extent by the fact that it appeared that the children were contented and happy on the farm. In reaching its conclusion, the trial court considered the opinion of this court in *Myers v. Myers, supra,* in which we stated, p. 21:

"What we have said in those cases was not a pronouncement of a rule applicable to all cases. We have considered

the welfare of the child as of paramount importance. We have said many times that each case must be considered upon its own facts and the situation then before the court. We have approved the awarding of children to their fathers when it appeared that their best welfare would be served by so doing. We have recognized that the trial court must necessarily have a wide discretion in such matters. This must be so, because there are so many factors that must be taken into consideration, and these can become better known by the trial judge than they can by us from the printed record."

It is evident that, in surrendering the children to respondent in 1943, appellant was acting because of urgent necessity, and not otherwise. With complete responsibility for two little boys, she could not work, and certainly, at that time and later, she and her family could not subsist on sixty dollars a month. Respondent refused to pay more. We are convinced that appellant then did the only thing that she could do when she turned the children over to respondent. Her right to the custody of her sons is nowise prejudiced by her act.

If matters had gone on as they were when the divorce was granted, without the increased costs of living due to war, and, if appellant had continued to live in her modest home with her two children, no change in the conditions would have existed which would warrant a court in awarding the children to respondent. The fact that respondent's financial standing has very greatly improved would not afford any ground whatever for taking the young children from appellant. The only effect which such a change in conditions would bring about would be to require respondent to increase the payments of support money to appellant. The material wealth of a parent is of the least consideration in determining, as between parents, the custody of a young child.

Respondent argues that he desires to train the boys to become dairy farmers, and, in due time, to send them to college, where they may complete their technical education. Questions of this nature may become important several years in the future, but at this time they are unimportant.

The trial court, during the course of the hearing held in May, 1942, referred to the difficulties of appellant's position as follows:

"I know that she is between the devil and the deep blue sea. If she stays home it takes more money for her to live and if she goes out to work you will come into court the next day and say she is leaving the children and ask for a change of custody."

In fact, the court's statement is applicable to the present situation. Respondent is contending that, as appellant turned the children over to him, she is not now entitled to resume their custody.

The general rule that young children should be with the mother, she being a fit person to care for them, is extremely persuasive in the case at bar. Any order made concerning the custody of minor children is always subject to revision by the court which entered the order, and changed conditions may always be met by appropriate judicial directions. ▮ Under the circumstances, in the case at bar, the conclusion reached by the trial court is not entitled to as much weight as is generally the case.

Here there has never been any question concerning the fitness of appellant to have her children. Apparently the court was simply convinced that "the children's welfare" would be better served by placing them under their father's care. The court stated that good schools were equally available to the children at either place.

The record contains comparatively little disputed testimony. Respondent testified that, when appellant suggested to him that he take the children, she did not tell him that his custody was to be for a limited time. Appellant testified that she expressly so stated. In our opinion, her testimony is to be believed, it being supported by circumstances and everything that she has done since the divorce was granted.

Where the moral character of a parent is under judicial examination and the testimony is in dispute, or where the general fitness of a parent to have custody of a child is disputed and the court has the advantage of hearing the testimony and seeing the parent and witnesses concerned,

the opinion of the trial court is entitled to more weight than in such a case as this, where the trial court was required to estimate a situation upon largely undisputed testimony, and simply weigh one situation against another.

After careful consideration, we hold that the trial court erred in depriving appellant of the custody of her children and in awarding their custody to respondent.

In her petition praying that the custody of the children be awarded to her, appellant alleged that respondent was able to pay "the sum of at least $150 per month for the support of plaintiff and of the minor children of the parties," and on the hearing appellant testified as follows:

"Q. You would be perfectly satisfied to stay home and take care of these children for $150 a month? A. Yes, sir, I would."

Under the circumstances disclosed by the record, respondent should pay to appellant not less than $150 a month for the support of appellant, the two children, and the maintenance of a home for them.

Upon the receipt of the remittitur in this case, the trial court may hold a further hearing and take testimony if deemed necessary, and increase this allowance if deemed advisable.

Respondent should also, from time to time, pay, in addition to the allowance made, such sums as may be necessary for medical or dental service and any other extraordinary expenses incurred on behalf of the children.

The order to be entered by the superior court will, of course, provide for the right of respondent to see his children and have them visit him at such times and under such circumstances as the trial court may deem proper.

The order appealed from is reversed, with instructions to the lower court to proceed in accordance with this opinion. Upon the entry of a new order, the trial court will fix an attorneys' fee, to be paid by respondent to appellant, in a sum not less than four hundred dollars.

STEINERT, SIMPSON, and MALLERY, JJ., concur.

MILLARD, J. (dissenting in part)—Appellant's attorneys are entitled to a fee of not less than one thousand dollars. The standard of compensation we in the past fixed for physicians and surgeons should be the same for lawyers. An allowance of not less than two hundred fifty dollars monthly should be made for the support and education of the children. The father is able to pay.