[No. 30209. Department One. June 26, 1947.]

LOUIS F. WARNECKE, *Appellant*, v. BARBARA J. WARNECKE, *Respondent*.[1]

*Dyar & Aten* and *Robertson & Smith,* for appellant.

*Reilly & Cael,* for respondent.

SIMPSON, J.—Plaintiff instituted this action for the purpose of securing a decree of divorce from the defendant and the custody of their child. The complaint charged cruel and inhuman treatment on the part of defendant, claimed that defendant was unfit to have the custody and control of their child, and asked that the care, custody, and control of the child be given to the plaintiff. The answer challenged the truth of the allegations contained in the complaint. The trial resulted in the entry of an interlocutory order, granting a divorce to plaintiff and giving the custody of the child to defendant.

Plaintiff, in his appeal, assigns as error certain findings of fact and the order which gave the minor child to defendant.

[1]Reported in 182 P. (2d) 699.

The one question before us is whether the trial court committed error in awarding the custody of the minor child to defendant.

 In cases of this kind, the welfare of the minor children is the sole matter with which the court is concerned. Their custody is of supreme importance, regardless of the claims and personal desires of the parents. Even the wishes of children in such cases must yield to the determination of what is for their ultimate good.

Courts are never called upon to decide questions of greater concern than that of the custody of children. The courts are called upon in such cases to use great care and wisdom because their dispositions have far-reaching consequences. The physical care of a child is of small importance compared to his moral and spiritual upbringing. Children should, if they are to be good, upright, law-abiding citizens, be surrounded by a wholesome, moral atmosphere. It is not amiss to stress the value of bending the twig so that the tree may later be inclined properly—that is, "Train up a child in the way he should go: and when he is old, he will not depart from it." Prov. 22: 6.

It has been found true that a child may suffer abuse; it may be reared in poverty; it may be surrounded by unwholesome quarters where cleanliness is not stressed, and still grow up to be a useful citizen of our country. But if a child is surrounded by immoral influences, those influences will make an indelible impression for bad in his heart, and in his mind. From such surroundings is born the delinquent child who may later become an inmate of our penal institutions.

Before giving our reasons for a decision, we deem it necessary to set out at some length the admitted facts and some of the evidence introduced by the parties.

Appellant and respondent were married June 7, 1942. One child, a girl, was born to this union. Appellant was inducted into the United States army March 18, 1943, and was sent overseas April 10, 1944. He received an honorable discharge from the army October 28, 1945. After their marriage, the parties lived for a time in Spokane, where

appellant was employed in a Safeway store. When he entered the service, his wife went to live with his parents at Wilbur and stayed there about nine months. She then moved into a house in Wilbur and later lived in an apartment.

During the time appellant was in the service, respondent received an allotment—eighty dollars per month until October 2, 1944, and one hundred dollars per month thereafter, another child having been born to respondent on that date. Respondent testified that appellant was not the father of the child. At certain times during the time appellant was in the service, respondent would attend dances and remain away from home overnight and, at one time, left for a dance on Saturday evening, and didn't return home until Monday. Respondent admitted being drunk on the last occasion mentioned. At one time, she wrote a letter to her husband which contained the following statement:

"I swear to God on a stack of Bibles that I will never get drunk again in my life as long as we aren't together. That is what this all leads up to. I guess I am a second Theo only I can keep from drinking and he can't."

Concerning this letter, she testified on the witness stand as follows:

"Now, in that statement you meant to tell your husband that you had been getting drunk, but that you were going to swear off, and you were not going to get drunk again as long as you and he were not together? A. No, I didn't mean that. Q. What did you mean? A. I meant that I would not drink any more; but I had not been getting what you would call drunk. Q. You understand there is a difference between getting drunk and taking a drink? A. Yes. Q. You said, 'I will never get drunk again in my life?' A. Well, I had gotten drunk with Louis."

The mother of appellant cared for her grandchild during the various times it was ill. Respondent spent a week during June, 1945, at the home of Mr. and Mrs. Peasley in Keller, Washington, at the invitation of a man named Oscar McFarland. During that period of time, respondent

and McFarland, according to Mrs. Peasley, spent much time together and were quite "chummy."

Witnesses for respondent testified that she cared for her child properly and, in their opinion, was a fit and proper person to care for her minor child.

At the close of the trial, the court stated:

"Under the testimony, as I find it, the plaintiff must be granted an interlocutory decree of divorce. The defendant has wilfully violated her marital obligations. Her stepping aside from the path of rectitude has not been condoned by the plaintiff husband. No blame can be attached to him for that attitude. The defendant has sinned, and sinned grievously. She has not shown the moral stamina and stability which this child now of the age of about three and a half years has the right to expect from a mother. . . .

"Nothing has been said here by any of the witnesses which reflects in any way upon the plaintiff in this case, the husband, and father of this child. He was a reputable citizen and I believe he will do the best he can if the Court should award the child to him, to see that it is properly supported, educated, instructed, and maintained. Is he in a position to do that better than the mother? . . .

"Taking everything into consideration, and with the knowledge that this mother has stepped aside from the path of virtue and has not at all times conducted herself as she should, does it not appear that, taking everything into consideration for the present, at least, and subject to the further order of the Court, depending upon her future conduct, that the best welfare of this child will be provided by awarding its custody to the defendant, subject to the further order of the Court, and that such methods may be found by the Court as may be necessary for the welfare of the child?"

Thereafter, the court made findings of fact, a portion of which are as follows:

"5. That the defendant during the marital relation aforesaid has been guilty of cruel treatment of and personal indignities toward the plaintiff, rendering his life burdensome, in that, among other things, the defendant contrary to the wishes of the plaintiff has consorted with strange men, unknown to plaintiff, thereby causing plaintiff great mental anguish and distress of mind and has manifested a lack of affection and an unconcealed aversion for plaintiff.

"6. That the defendant has been guilty of drunkenness and by reason of her conduct, aforesaid, the defendant has destroyed plaintiff's affection for her, and it is impossible for the plaintiff and defendant to again live as husband and wife.

"7. That the minor child of the parties to this suit is of the tender age of three and one-half years and requires and demands the care and attention that only her mother can give. That notwithstanding the fact that the defendant has stepped aside from the path of virtue, she has at all times properly looked after the physical needs of her child. That the welfare of this child will best be provided for, at least for the present, by awarding its custody to the defendant, subject to the further order of the court."

A review of our decisions on the question now before us, seems appropriate at this time.

In *Kentzler v. Kentzler,* 3 Wash. 166, 28 Pac. 370, 28 Am. St. 21, this court reversed a judgment giving the children to their mother where it appeared that she was without property, had no means of support save her personal earnings of fifteen dollars per month, was in poor health, and lived with her mother in immoral surroundings, and that the father was an industrious and sober man, earning one hundred dollars per month.

*Cozard v. Cozard,* 48 Wash. 124, 92 Pac. 935, does not set out much of the testimony. It is evident, however, that the mother was denied custody because she had committed certain acts of adultery.

In *Freeland v. Freeland,* 92 Wash. 482, 159 Pac. 698, this court considered an appeal from an order modifying the decree of divorce. The evidence relating to the character and reputation of the parties was not set out in that opinion. This court made the following statement:

"The proofs of the appellant were to the effect that respondent had been indiscreet in her conduct with men subsequent to her divorce. Nothing, however, was established showing moral turpitude on her part. But the fact that the conduct of a mother is not what others might think the most proper is not sufficient of itself to deprive her of the right to the permanent or periodic custody of her minor child. Mother love is a dominant trait in even the

weakest of women, and as a general thing, surpasses the paternal affection for the common offspring, and moreover, a child needs a mother's care even more than a father's. For these reasons, courts are loath to deprive the mother of the custody of her children, and will not do so unless it be shown clearly that she is so far an unfit and improper person to be entrusted with such custody as to endanger the welfare of the children."

In *Smith v. Frates,* 107 Wash. 13, 180 Pac. 880, the children were awarded to their father because of the gross negligence of the mother. These children were three girls of tender years. After the divorce, both parties remarried, and the mother applied to have the original decree modified so that she might have the absolute custody and control of her children. The trial court granted her petition. The statement made by this court in that case is of so great importance that we make the following liberal quotation:

"At the time of the marriage of respondent, Martha Smith (formerly Mrs. Martha Frates), and appellant, Louis A. Frates, neither had any means. They purchased a place upon which a residence was built largely by his own labor in the evenings and on holidays. About the only fault she charged him with was the excessive use of intoxicating liquors while they were married, which is positively denied by him, his close neighbors, and his business career. He worked regularly for years for the same employer, at constantly increasing wages; and later conducted a business of his own, with employees to help. Among such employees, for some length of time, was the present husband of respondent. Appellant paid cash for his family expenses, modernized their six-room residence, improved the grounds with a lawn and fruit trees and owed only $700 on the residence at the date of the divorce. Respondent became frivolous, and finally habitually neglectful of her home and children. She often spent whole days, and more frequently afternoons and evenings until late at night, without her husband, downtown and at dances, leaving the children to be cared for by neighbors, without appointments therefor oftener than otherwise, until appellant would return from his work, when he would get the supper and put the children to bed. On account of her improper relations with appellant's brother, first denied but later admitted by her when confronted by the accusation of her own little

daughter, she caused a lasting estrangement between the brothers. Still later, about July 16, 1916, she voluntarily confessed to her husband her criminal conduct with E. N. Smith, her present husband, who at that time was an employee of her husband's. Shortly, appellant's experience proved in no uncertain way the verity of her confession. Within a little while, as she testifies herself, she deserted her husband while he was at work and the children were at school. She worked around at housework, corresponded with, and met Smith. In the meantime, for three or four months, appellant received the services of his children's maternal grandmother in caring for the children at his home, after which he placed them together, from time to time, at different homes of friends of his until after his second marriage. He preferred that she appear as plaintiff in the divorce suit. She gave him a conveyance of the property upon which there was a mortgage of $700 (since paid off by him), made no claim to the children at that time, and waived all claim for alimony. The decree entered in the divorce case on August 18, 1917, simply dissolved the bonds of matrimony existing between the parties, gave the care, custody and control of the three children to the defendant, and, as provided by statute, prohibited each party from contracting marriage with a third party within six months.

"On the first day after the expiration of the limitation of time fixed in the decree, viz., February 18, 1918, she married Smith—the associate and author of her former delinquencies. She and her present husband own no property. After their marriage, they lived in a single housekeeping room in an apartment house until a few days before the hearing of her application for the custody of the children, when they rented and moved into a small house supplied with their furniture. Her husband works at one of the shipyards at Seattle where, notwithstanding the commonly-known high wages, he gets less than $4 per day for his work. She works at a store for small wages.

"On the other hand, appellant and a partner conduct a growing business of their own which yields a net income of $200 per month to appellant. His present wife is the owner of a hospital in Seattle which receives the patronage influenced by twelve to fifteen reputable physicians. Her business is prospering and at the present time returns a net income of $300 per month. She takes an interest in the children, remaining at home until after they go to school,

when she goes to her place of business for the day's work, returning in the late afternoon. Usually, on Saturday afternoons she takes the girls to a picture show or some other place of amusement, and on Sundays after they attend Sunday school she takes them out for a ride in appellant's family car. The children are well dressed and cared for at appellant's home, where they have the services of a housekeeper who has raised a family of nine children of her own.

"The question of whether one of the parents shall prevail, in the spirit of victory over the other, is in no sense involved in this case. Their ways are divided; their rights are subordinate. The serious matter is the welfare of the children, who should be kept together, if possible, and not denied each the others' society. From a material point of view, there is no question appellant's home is to be preferred for the children. Other and more important considerations suggest the same course. In cases of divorce where children of very tender years are involved, other things being near equal, the mother is preferred as their custodian, more especially in the case of female children. But there are exceptions to this rule which become more controlling as the child grows older, the chief of which becomes impelling in the case of a female child as it reaches the age of ten or twelve years. In the home of respondent and her present husband, these children would be constantly reminded of the past irregularities of a mother who, in order to finally consummate her present marriage, willingly and willfully abandoned her own children to their father whom she deserted. Such influences would be prejudicial to the best interests of the children, who should not be further denied their natural right simply out of respect for the holy institution of a mother's love, which in this case is proven to be dishonored by a maternal instinct more fancied than real. The children have lost their mother's influence; but no good reason is shown why they should lose the protection and care of their father."

*McDaniel v. McDaniel,* 145 Wash. 54, 258 Pac. 1026, has to do with a petition to modify a decree of divorce which had given the minor children to their paternal grandparents. This court refused to give the children to their mother.

In *Broesch v. Broesch,* 159 Wash. 409, 293 Pac. 464, this court affirmed the decision of the trial court which had awarded the custody of a seven-year-old boy to his father

because an older half brother of bad repute lived with the mother. In that case, there was nothing said detrimental to the conduct, reputation, or character of the boy's mother.

*Ayers v. Ayers,* 188 Wash. 540, 62 P. (2d) 1358, is another case having to do with a final decree of divorce in which the permanent custody of the children was given to the father, the reason being that the mother had remarried, had other ties, duties, and lived in another state, and that the father was in a better position to care for the children than was the mother.

*Eliason v. Eliason,* 10 Wn. (2d) 719, 118 P. (2d) 170, had to do with the custody of a minor child. The trial court had placed the child in the custody of the plaintiff's mother until the further order of the court, and the mother had been given the right to visit her child at all reasonable and proper times. In speaking of the facts in that case, we stated:

"To narrate the evidence would serve no useful purpose. It is sufficient to say that appellant neglected her child on numerous occasions, and conducted herself in a manner unbecoming for a mother. That respondent may have been partially to blame does not mitigate the effect of her actions. It should be stated, however, that appellant was not shown to have been guilty of any immoral conduct."

In deciding the case, this court had the following to say:

"In cases of this nature, we give great weight to the conclusions of the trial court. Consequently, its finding will not be changed unless an abuse of discretion patently appears. A careful search of the record convinces us that the court did not abuse its discretion in making the temporary award of appellant's son to his paternal grandmother. The court had all the witnesses before him; he was able to test their credibility and weigh their evidence in a manner denied to this court. From their behavior and attitude in the court room and from his intimate knowledge of many things concerning which the witnesses testified, he was able to arrive at a decision which satisfied him that the child should go to the grandmother until such time as appellant should prove to the court a determination to conduct herself in a manner in keeping with the duties of a mother."

*Taylor v. Taylor,* 14 Wn. (2d) 293, 126 P. (2d) 855, concerned the custody of children, subsequent to the entry of

a decree of divorce. In the original action, the children had been given to the mother for a period of one year. Thereafter, the father asked for a change of custody on the ground that the mother of the children had been "running around with a married man." The trial court gave the children to their father, and the mother appealed. The basis of the trial court's decision was that the mother, within a week after the original hearing, was found constantly in association with another man who had a family of his own. This man had taken her on two or three trips to Yakima, and to various shows. The judgment of the trial court was affirmed, and this court in so doing, stated:

"We are of the opinion that in this case the trial court was convinced that the welfare of these children would be best served, at least for the present, by placing them in the custody of their father, and we are unable to say, from an examination of the record, that the court abused the discretion vested in it, regardless of the fact that he frankly stated that the testimony did not show any immoral conduct on the part of appellant."

In *Lichtenberg v. Lichtenberg*, 15 Wn. (2d) 226, 130 P. (2d) 371, this court considered the action of the trial court in awarding the custody of two minor children to their father. The evidence showed that the mother had been addicted to the excessive use of intoxicating liquor and had neglected her two small children. In that case, the mother contended that she should be allowed the custody of her minor children for the reason that it was not proven that she was immoral. However, this court sustained the judgment of the trial court, basing its conclusion upon the *Eliason* case.

*Lindblom v. Lindblom*, 22 Wn. (2d) 291, 155 P. (2d) 790, is another divorce case in which the custody of children was involved. In that case, the children were given to their father, with the right of the mother to visit at reasonable times. The evidence showed that, for a considerable time before the action had been started, the mother of the children had become interested in a man who had been a neighbor and friend of the family, and also carried on a

romantic correspondence with another man. She then tired of her life on the farm with her children and started to work in a plant devoted to war work. It is impracticable to set out all of the testimony in that case. However, it is proper to say that the mother had not been guilty of any sex immorality. This court affirmed the action of the trial court in giving the care, custody, and control of the children to their father.

In *Mitchell v. Mitchell*, 24 Wn. (2d) 701, 166 P. (2d) 938, this court upheld the judgment of the trial court which had given the minor children of the divorced parties to their father. The evidence is not set out in that case, but the court did say that the testimony concerning her immoral conduct was substantially corroborated.

In *Rogers v. Rogers*, 25 Wn. (2d) 369, 170 P. (2d) 859, it is disclosed that the mother of the children was guilty of some misbehavior which did not include sex immorality. The children were awarded her, and this court affirmed the judgment of the trial court.

The case of *Aubry v. Aubry*, 26 Wn. (2d) 69, 173 P. (2d) 121, is a case very much in point. In that case, the parties had a young son who was awarded to the plaintiff's mother, with permission to the defendant to visit him at reasonable times. In passing upon the merits of the case, this court stated as follows:

"In July, 1944, the wife met another man with whom she became infatuated. She and her lover, who stated he desired to marry her, were frequently together at different places of amusement, and he visited her day and night in the home of her parents and in the apartment, the rent of which was paid with portion of allotment to the wife from husband's naval pay. On one occasion, her sweetheart remained in that apartment all night because he missed the last bus; however, there is no evidence of illicit relationship of those two parties at that or any other time. She admitted her love for the man, and he and she openly displayed their affection for each other.

"During 1943 and 1944, immediately prior to his induction into the navy, plaintiff, then employed in a shipyard, frequently failed to return home promptly after his shift ended at 11:30 p. m. On two occasions, he was away from home

all night and was often seen escorting a certain woman from her place of employment in the shipyard to her home. The wife learned of these escapades after suit for divorce was instituted. The husband and wife do not deem improper their association with persons of the opposite sex. Neither conformed during their brief married life to the strict conventionality of *Victorian* society during the last half of the nineteenth century, but there is nothing other than recited above to sustain a charge of infidelity on the part of either.

"When the husband was informed of his wife's conduct, he obtained leave of absence and returned to Tacoma, where, on February 28, 1945, he instituted this action for divorce against his wife, who admitted to her husband that she loved the 'other man.'

"The trial court found that, for more than a year last past, the defendant had been guilty of conduct incompatible with the dignity of a wife and mother and had associated, both night and day, with a certain man in the apartment of plaintiff and defendant and elsewhere in the city of Tacoma; and that, by reason of her conduct, the parties separated from each other. The court also found that defendant was not a fit and proper person to have custody of the minor child of the parties, and that both parties are entitled to a divorce. The court further found that plaintiff's mother was a fit and proper person to have custody of the minor child of the parties and has a suitable home in which to rear the child."

The result of the appeal to this court was an affirmance.

In *Storgaard v. Storgaard,* 26 Wn. (2d) 388, 174 P. (2d) 309, this court modified a judgment awarding custody of minor children to their mother. In that case, it appears that the condition of the home was filthy. No immoral conduct was shown, but this court reversed the finding of the trial court, and the custody of the children was awarded to the father. In passing upon the issues of that case, we had occasion to say that "a mother's moral unfitness need not be proved in order to justify the court in awarding the custody of the children to a father."

It will be observed that in none of the cited cases has this court approved a judgment giving the custody of a minor child to a parent who has been guilty of immoral conduct. While the welfare of the child is of paramount

importance, it is proper to consider the natural feelings and legitimate interest of the parents. Hardships will necessarily follow any decree that could be herein rendered; and justice demands that, if possible, they be distributed so as to bear lightest on the unoffending party.

Before appellant and respondent parted, the child, the fruit of their marriage, was cared for by them jointly. It came into existence, and became the common object of their affection, under an obligation on the part of each of fidelity to the marriage vow. Had that vow been kept, it would have remained in their joint care, and this unfortunate litigation would not have arisen. Appellant's home (on the continued existence of which the joint care of the child by himself and respondent depended) has been broken up by the respondent's misconduct, and it would be not only unjust, but also contrary to the law announced in the cited cases, to also deprive him of his child. As stated by the trial court, nothing was said by any of the witnesses which reflected in any way upon the appellant in this case. He is a reputable citizen, and, we believe, as did the trial court, that he will see to it that his child is properly supported, instructed, and maintained.

It is our conclusion that the child's welfare will be best promoted, and justice best served, by giving her into the care, custody, and control of her father, and allowing respondent to visit her at all proper times. It is so ordered.

MALLERY, C. J., MILLARD, STEINERT, and ABEL, JJ., concur.