[No. 37683. Department One. August 12, 1965.]

ERIK C. SCHULTZ, *Appellant*, v. BARBARA R. SCHULTZ, *Respondent.**

*Kumm, Maxwell, Petersen & Lee*, for appellant.

KALIN, J.†—The parties obtained a divorce on February 5, 1964. The husband appeals from that portion of the divorce decree which awards custody of the three minor children of the parties to the mother.

At the time of trial, the minor children were ages 13, 8, and 2.

*Reported in 404 P.2d 987.

†Judge Kalin is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

Respondent commenced having mental troubles while living in Tacoma in November, 1955, shortly after the birth of their second child, for which she was treated privately. Within a month or two, she took an overdose of a digitalis-like product. She was then placed under the care of a psychiatrist in Seattle, who gave her psychotherapy and electroshock treatments. Her condition was diagnosed as "a depressive reaction with anxiety, with elements of paranoid thinking, but not pronounced." Her problems appeared to be in a state of remission until early 1958, when the parties were living in White Plains, New York, at which time respondent was committed to a state hospital for several months. Upon her release, she became an out-patient at a mental health clinic. In the fall of 1958, and while still living in New York, respondent took an overdose of tranquilizing drugs. She was again hospitalized until April, 1959, and on release again became an out-patient at a mental health clinic. The parties returned to Seattle where respondent's symptoms became aggravated and she was privately hospitalized in June of 1962. Out-patient care followed.

In the fall of 1962, respondent was admitted to Northern State Hospital as a voluntary patient. She remained there almost continuously for 5 months. Sometime during this period, she cut her left wrist with a razor blade. On March 4, 1963, she was "Released as improved." The divorce action was commenced on March 7, 1963. The parties and their children have not lived together as a family unit since her last release. Respondent has had no relapse from time of last release until time of trial in January, 1964.

The respondent had the children for a period of 6 weeks during the summer of 1963, after which they were returned to the father until time of trial.

At the trial, several neighbors testified on behalf of respondent to the effect that she did a reasonably good job of looking after the children when she had their custody for the 6 weeks during the summer of 1963. However, one of these witnesses, a next-door neighbor, further testified

that while respondent was visiting her home with the 8-year old daughter, she became nervous and blamed the child for her illness. The witness became so concerned for the safety of the children that she sneaked over to peek in respondent's window and then called appellant's relatives about the incident.

The only medical testimony in the record is to the effect that if respondent got custody of the children, the responsibility would probably bring on a recurrence of her problems and would, in any event, have an adverse effect on a guarded prognosis.

The testimony of the attending psychiatrist is to the effect that respondent's custody of the children would have "a very adverse effect on the personality development of the children."

There was no medical evidence to the contrary, although neighbors testified to their past observations of the maternal attributes and good character of respondent.

The children had spent most of the time before trial with appellant and the paternal grandmother and appeared to lead normal healthy lives during this period.

The trial judge declined to hear testimony or to talk in chambers with the two older children, but there is evidence that they preferred to live with appellant in the home of the paternal grandparents.

The trial court, in its oral decision at the conclusion of the trial, stated *inter alia*:

I find that it is not probable that she will have a reoccurrence of the illness which will endanger the welfare of the children. If she should feel sleepless nights, these danger signs that she recognizes, her mother love will guide her to seek assistance for her own good and for the good of the children because she will know that this matter will collapse around her again unless she does.

This court is reluctant to disturb the determination of the trial court with reference to the custody of children. However, where it appears from the record that the mother is not a fit person to have custody of children and their best interests would be served by awarding cus-

tody to the father, then the decree must be modified accordingly. We stated in *Atkinson v. Atkinson*, 38 Wn.2d 769, 772, 231 P.2d 641 (1951):

> We are loathe to disturb the determination of the trial court with reference to the custody of children, for the reason that no written record can capture the nuances or adequately portray the conflicting emotions which are so much a part of the judicial determination of what is best for the physical and spiritual welfare of a child, and for other reasons set forth in our opinions. [Citing cases.] But on the record before us, we cannot believe that Mrs. Atkinson, with her fixations and obsessions, is a fit person to have the custody of this child.

Our cases are legion that paramount consideration in custody cases must always be the welfare of the children. See *Cumbie v. Cumbie*, 61 Wn.2d 669, 379 P.2d 918 (1963). It follows that custody will be awarded to a fit parent where the other is unfit. The fitness or unfitness of a parent is not determined solely by moral considerations. Mental disturbance may also render a parent ineligible for child custodial responsibilities. *Atkinson, supra.* Nor need a mother's moral unfitness be proved in order to justify the court in awarding custody of the children to the father. *Storgaard v. Storgaard*, 26 Wn.2d 388, 174 P.2d 309 (1946). It was stated in *Lindblom v. Lindblom*, 22 Wn.2d 291, 296, 155 P.2d 790 (1945):

> A careful consideration of all the evidence convinces us that the welfare of the children would be endangered if they were given into the custody of their mother. It is not necessary to prove moral unfitness on the part of a mother in order to deprive her of the care and custody of her children. Their health and physical well-being must be taken into consideration at all times.

■ While it is hoped that the respondent's condition will improve and that she will not suffer a relapse, the award of custody cannot rest on hoped-for recovery. The past 8-year history of intermittent mental disorders requiring hospitalization, and a record of three attempted suicides, hardly augurs well for the existence of a healthy home for the bringing up of youngsters. This past record should be

the basis of the court's decision. We stated in *Storgaard, supra,* p. 391:

It appears that the court granted the respondent custody of the children with the hope and upon the condition that she would improve the home conditions. We think the decree should have been based upon the past eight years' experience as to the present facts, and that the possibility for respondent's improvement in the future can best be provided for by a modification of the decree after the changed circumstances are established.

It is clear that a parent who is an adjudged incompetent is not a fit custodian for children. In cases where this is not so clear, expert opinion must be sought and mental health must be carefully weighed with other factors, always bearing in mind the welfare of the child as the foremost consideration. 74 A.L.R.2d 1075.

We hold that it was error in this case to award custody of the three children to respondent.

The judgment is accordingly reversed and remanded to the superior court with instructions to enter judgment in conformity with this opinion.

ROSELLINI, C. J., HUNTER and HALE, JJ., concur.

HILL, J., concurs in the result.