[No. 4847-1-III. Division Three. March 3, 1983.]

*In the Matter of* GRACE MOSELEY.

THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES,
*Respondent,* v. BARBARA MOSELEY,
*Appellant.*

*R. Bryan Geissler* and *Lambarth & Geissler,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Christine Gregoire, Deputy,* for respondent.

*Frank R. Hoover* and *Woeppel & Hoover,* for guardian ad litem.

MUNSON, J.—Barbara Moseley appeals the termination of her parental rights to Grace. We affirm.

A Department of Social and Health Services caseworker first contacted Miss Moseley October 3, 1979, when he received a report she was about to give birth to a child for whom she could not care. Grace was born October 9, 1979, and on October 12, 1979, DSHS placed Miss Moseley in an adult foster care facility. On October 30, 1979, a dependency order was filed because Grace had failed to gain weight since birth. By November 19, 1979, Grace's weight rose to 9½ pounds while she was in foster care. The caseworker believed the problem was Miss Moseley could not understand the baby's need for more food. Miss Moseley believed the problem was DSHS had placed her in a home where she received inadequate food because of her limited finances.

After initial attempts to correct Miss Moseley's problems failed, DSHS assigned the case to a foster care caseworker April 1, 1980. Grace was adjudged dependent April 2, 1980, but the goal was still to reunite Miss Moseley with Grace. On April 10, 1980, the new caseworker met with Miss Moseley, the foster mother, and two counselors from Catholic Family Service to develop a detailed plan which would lead to reunification. Miss Moseley was to receive counseling at Catholic Family Service; concurrently the foster

mother would teach her the skills necessary to raise Grace. Miss Moseley agreed to the plan.

By September 1980, however, DSHS decided Miss Moseley was unable to learn the skills necessary to become Grace's parent, so a termination petition was filed. The services were continued after the petition was filed, and eventually, the petition was dismissed because Miss Moseley began to improve when taking prescribed antipsychotic medication. Parental education at the Community Mental Health Center was offered, but then withdrawn when the therapist filed a complaint alleging Miss Moseley sexually abused Grace. A new petition for termination was filed when the DSHS caseworker, after consulting with others, decided that termination was in Grace's best interests.

At the termination hearing, two DSHS caseworkers, three homemakers, two counselors from Catholic Family Service, the foster mother involved in the reunification plan, a psychologist and a psychiatrist testified to the services provided. Miss Moseley was involved in the "woman–to–woman support group" and also individually counseled at Catholic Family Service. During the same time, either the foster mother, a homemaker, or a caseworker would meet with Miss Moseley and Grace in an attempt to teach Miss Moseley the skills necessary to take over full–time care of Grace.

The record indicates Miss Moseley was extremely hostile to each person and resented their interference in her life. Each person also noted that, under stress, Miss Moseley would either "blank out"—act as if she was not present—or make a remark totally unrelated to the discussion at hand. In her care of Grace, the witnesses stated she did not seem to understand Grace's needs. Such simple tasks as feeding and bathing Grace were difficult for her. Grace, normally a bright and cheerful child, would react to Miss Moseley's smothering love[1] by becoming tense and withdrawn.

---

[1] If the only criterion before this court was Miss Moseley's love for Grace, Miss Moseley would clearly be a proper parent. Her deep love for Grace is apparent

E. Clay Jorgensen, clinical psychologist and director of Child and Family Services at the Community Mental Health Center, evaluated Miss Moseley December 27, 1979, October 30, 1980, and January 15, 1981. He testified she was a socially isolated individual who had a history of outpatient treatment related to manic depression, schizophrenia, and psychotic conditions. On the WAIS and MMPI tests, she showed signs of thought disorder, anger, and autistic thinking. He indicated these disorders would be long term even with treatment. As late as October 1980, Dr. Jorgensen did not think Miss Moseley was capable of parenting her child, mostly because the thought disorders created problems with judgment. He also concluded in October 1980, "it was pretty unlikely that she was ever going to progress to the point where she could provide adequate care for the child."

Dr. Mark L. Chalem, a psychiatrist, met Miss Moseley October 3, 1980, and had seen her approximately 15 times by June 17, 1981. By January 8, 1981, he believed her personality development had been sufficient that he could recommend to DSHS that termination was premature. When he began treating her, he noted formal thought disorder, but he noted dramatic improvement and believed her problem was largely in remission. He had been impressed with Miss Moseley's concern for Grace and her "quite excellent judgment" in planning for Grace. Dr. Chalem was familiar with her mental history as far back as age 13 or 14 and was very aware of the medical problems relating to a car accident occurring in 1970. He saw great progress from when she was declared mentally disabled in 1974. When presented with the history of services provided, Dr. Chalem stated he was "less optimistic of her ability to openly accept help and benefit by it." Dr. Chalem believed Miss

---

throughout the record. We must also, however, consider whether Miss Moseley can implement the practicalities of her love—feed, bathe, educate, provide shelter, and protect Grace from harm as she grows. *See In re Adoption of Dobbs*, 12 Wn. App. 676, 531 P.2d 303 (1975). Unfortunately, the evidence supports the conclusion of the trial court that Miss Moseley is not able to meet these objectives.

Moseley had reached her "maximal" state when her dosage of antipsychotic medication was 1½ times greater than at present. Finally, when asked whether he could say with any degree of certainty that Miss Moseley could care for Grace, he replied he could not.

Because Miss Moseley began to stabilize under Dr. Chalem's care, Catholic Family Service counseling was discontinued and Miss Moseley was sent to the parent–toddler group at the Community Mental Health Center. On February 6, 1981, a counselor noted inappropriate sexual behavior on the part of Miss Moseley toward Grace. She filed a child abuse report, stating such behavior was dangerous to the child. This report led the DSHS caseworker (after consultation with others involved in Miss Moseley's treatment) to again recommend termination.

Dr. Jorgensen testified that, although he did not believe Miss Moseley formed an intent to commit a sexual act, the incident was a good example of her distorted judgment. After reviewing all the services provided to Miss Moseley, he stated there were no services which would ensure a high chance of reuniting Miss Moseley with Grace and termination of parental rights now was in Grace's best interests.

On October 8, 1981, the trial court terminated Miss Moseley's parental rights. Miss Moseley appealed, contending (1) she was denied effective assistance of counsel; (2) the findings were unsupported by the evidence; and (3) the trial court erred in considering evidence of Grace's adoptability before terminating her parental rights.

Miss Moseley contends she was denied effective assistance of counsel because her attorney failed to develop the details of the 1970 automobile accident. She argues she is entitled to the full panoply of due process safeguards and asks this court to adopt a test of prejudice developed in *State v. Kennedy*, 8 Wn. App. 633, 638, 508 P.2d 1386 (1973):

Accordingly, if we can find anything in the record which indicates that there is a possibility that the defendant may have been actually prejudiced, he has been denied

his right to effective counsel.

*Kennedy* provides a test for appellate review when two criminal defendants are represented by one attorney. We do not need to analogize to the criminal area to find the appropriate test.

 Recognizing the significant liberty interests for all parties involved in a parental termination case, our Supreme Court in *In re Luscier,* 84 Wn.2d 135, 138, 524 P.2d 906 (1974), stated a "parent's right to counsel in this matter is mandated by the constitutional guaranties of due process under the fourteenth amendment to the United States Constitution and article 1, section 3 of the Washington Constitution." As important, *Luscier* stated child deprivation hearings are the "subject of close scrutiny" and the role of the court is to carefully review the hearing "to assure that the interested parties have been accorded the procedural fairness required by due process of law." *In re Luscier, supra* at 137.

Procedural fairness is provided for in civil due process. Notice, open testimony, time to prepare and respond to charges, and a meaningful hearing before a competent tribunal in an orderly proceeding are all elements of civil due process. *In re Myricks,* 85 Wn.2d 252, 533 P.2d 841 (1975); *Moore v. Burdman,* 84 Wn.2d 408, 526 P.2d 893 (1974); *In re Luscier, supra; In re Messmer,* 52 Wn.2d 510, 326 P.2d 1004 (1958); *In re Ross,* 45 Wn.2d 654, 277 P.2d 335 (1954); *In re Petrie,* 40 Wn.2d 809, 246 P.2d 465 (1952); *In re Darrow,* 32 Wn. App. 803, 649 P.2d 858 (1982); *Halsted v. Sallee,* 31 Wn. App. 193, 639 P.2d 877 (1982); *In re Akers,* 22 Wn. App. 749, 592 P.2d 647 (1979); *Esmieu v. Schrag,* 15 Wn. App. 260, 548 P.2d 581 (1976), *aff'd,* 88 Wn.2d 490, 563 P.2d 203 (1977); *In re Houts,* 7 Wn. App. 476, 499 P.2d 1276 (1972); *In re Martin,* 3 Wn. App. 405, 476 P.2d 134 (1970). Under this test, if it appears from the record that an attorney was not effective in providing a meaningful hearing, due process guaranties have not been met. The burden of proof lies with the petitioner. *Mason v. Cranor,*

42 Wn.2d 610, 257 P.2d 211, *cert. denied,* 346 U.S. 901 (1953), 349 U.S. 957 (1955).

We hold the civil test meets the procedural due process guaranties of article 1, section 3[2] of the Washington State Constitution and exceeds federal guaranties under the Fourteenth Amendment. *See Santosky v. Kramer,* 455 U.S. 745, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (1982); *Lassiter v. Department of Social Servs.,* 452 U.S. 18, 68 L. Ed. 2d 640, 101 S. Ct. 2153 (1981); *Mathews v. Eldridge,* 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976).

Miss Moseley contends the failure to further develop the details of the 1970 automobile accident is evidence of ineffective counsel.[3] She contends this evidence would have persuaded the court she had not received services capable of curing the physiological problems resulting from the accident. The record indicates, however, the trial court was amply aware of the earlier automobile accident and the impact it had on Miss Moseley's life. We cannot say the failure to further highlight 11–year–old events denied Miss Moseley a meaningful hearing.

Miss Moseley next contends she was not given adequate services by DSHS. She argues DSHS should have placed her under the care of a board certified neurologist who could better deal with the physiological trauma of the 1970 accident so the services provided had real meaning. She contends her stabilization on drugs near the time services ended provided her no real opportunity to understand and benefit from the services.

■ Shortly after Miss Moseley was first seen by Dr. Jorgensen, she was seen by Dr. James M. Kilgore, Jr., a psychiatrist/neurologist. While a close reading of each doctor's evaluation shows minor differences, the evaluations express parallel findings and recommend similar treatment,

---

[2]"Personal rights. No person shall be deprived of life, liberty, or property, without due process of law." Const. art. 1, § 3.

[3]Counsel at trial did an excellent job of championing his client's cause.

which Miss Moseley received. Thus, Miss Moseley was not prejudiced by placement with a psychologist. Although she contends the psychiatrist/neurologist would have stabilized her on medication earlier, the recommendation of the psychiatrist/neurologist does not mention medication. Rather, it affirms the DSHS reunification plan and clearly warns of the danger of allowing Miss Moseley to care for Grace. Moreover, the decision to terminate Miss Moseley's parental rights was made *after* she was fully stabilized on medication and no one could see a chance of measurable improvement in the foreseeable future. RCW 13.34.180(4); RCW 13.34.190. The decision correctly focused on Grace's best interests and was supported by substantial evidence. *Schultz v. Schultz,* 66 Wn.2d 713, 716, 404 P.2d 987 (1965); *In re Parzino,* 22 Wn. App. 88, 587 P.2d 201 (1978).

Miss Moseley contends finally that the trial court erred by considering the adoptability of Grace. Finding of fact 15 states the DSHS caseworker "found the child adoptable . . ."

■ Where a trial court's decision to terminate parental rights is based even partially on a child's chance for a "better home," prejudicial error has occurred. *In re Akers, supra.* The reason was best stated in *In re Day,* 189 Wash. 368, 382, 65 P.2d 1049 (1937):

> Mere temporal or social advantages weigh little as against the right of a parent, and the ties of blood should not be interfered with or the right of the parent abridged, save for the most powerful reasons.

In *Day, Akers,* and *In re Hendrickson,* 7 Wn. App. 485, 499 P.2d 908 (1972), the trial court's error was in deciding the child would have a better life with new parents without independently deciding whether the natural parents were unfit.

> However, once it has been found that a parent has forfeited her rights and duties toward the child by a consistent pattern of behavior demonstrating neglect of parental responsibilities, the concern of the court is whether a permanent deprivation order is in the best

interests of the child.

*In re Tarango,* 23 Wn. App. 126, 130, 595 P.2d 552 (1979).[4]

Because the finding of unfitness is supported by the evidence, we do not believe the trial court erred in hearing evidence of Grace's adoptability. The trial court's decision is affirmed.

ROE, C.J., and MCINTURFF, J., concur.

Reconsideration denied March 29, 1983.

Review denied by Supreme Court May 24, 1983.

---

[4]Although DSHS's mention of Grace's adoptability was meant as proof under RCW 13.34.180(6), we believe there are better ways to show: "That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home; . . ." We note DSHS proved its point with another witness by showing a child's adoption prospects diminish as the child grows older. We foresee situations where evidence of adoptability will greatly cloud the record on appeal, making it more difficult for this court to ensure the trial court's decision to terminate is based solely on parental unfitness.