[Nos. 13983-2-III; 13984-1-III; 13985-9-III; 13986-7-III. Division Three. June 13, 1995.]

*In re Dependency of* J.C. ET AL.

KATHY C., *Appellant*, v. DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*.

*Robert J. Reynolds,* for appellant.

*Kimberly A. Loranz, Assistant Attorney General,* for respondent.

SCHULTHEIS, J. — Kathy C.'s parental rights to her four children were terminated.[1] She contends the elements of RCW 13.34.180 were not proven by clear, cogent and

---

[1]Albert C.'s rights as the father were terminated as well. He did not concede the terminations, but made no effort to contest them either. He admitted to a drinking problem and agreed he had rejected all offers of services. He expressed a vague hope that he might be able to care for the children at some indefinite time in the future, but had no current plans. He has not appealed.

convincing evidence nor does the evidence sustain a finding that termination is in the best interests of the children. We reverse.

J.A., J.B., J.C. and J.D. range in age from 6 to 13.[2] Each was removed from the family home toward the end of 1991 and orders of dependency were entered on February 20, 1992. Orders of termination were entered on January 5, 1994.

June West was the assigned Department of Social and Health Services (DSHS) caseworker. She testified to 20 contacts by Child Protective Services with the C. family over the span of seven or eight years preceding the children's removal. The removal was occasioned by allegations of neglect, abuse and substance abuse by Ms. C. This was consistent with prior complaints of physical and sexual abuse, lack of medical care, filthy living conditions and other neglect. Removal was not precipitous. Another caseworker, Ms. Attaway, had been working with the family during the preceding six months. The home was in deplorable shape. Sanitation was substandard and the house was littered with rotten garbage, dirty clothes, food and animal feces. DSHS made the decision to remove when efforts to convince Ms. C. to clean the house and the children proved futile. When removed, the children suffered from advanced cases of ringworm and head lice. Ms. C. failed to administer prescribed medication. J.D. was found to have a cockroach embedded in his ear canal.

The oldest children were by then accustomed to assuming parental roles in caring for themselves and the younger girls. In addition to exhibiting significant anger problems, the two oldest children were learning disabled. J.D. was judged to be three to four years delayed in terms of scholastics. Physically, he was the size of a seven-year-old. J.C. was borderline retarded at the time of removal

---

[2]In keeping with standard practice, we use initials. As indicated in the caption, the children share the same initials. Certain facts are specific to an individual child and to avoid confusion they are referred to, from youngest to eldest, as J.A., J.B., J.C. and J.D.

with an IQ of 70. After a year and a half of foster care she was retested and found to have progressed to a more normal IQ of 97. J.B. also exhibited developmental delay and was placed in special education classes. She was taking medication for behavioral disorders. School officials advised Ms. West that unless something could be done to curb the girl's outbursts of anger and aggression, she would not be allowed to attend regular classes. The youngest child, J.A., was and still is the most outwardly angry of the four. Shortly prior to trial, she destroyed $2,000 worth of household goods in her foster parents' home. All J.A. was allowed to have in her bedroom was a mattress because she shreds everything she can put her hands on. Only five years old at the time of trial, she had the strength to punch through a wall and broke her arm in one such incident. While trial was in progress, she was in the psychiatric ward at Sacred Heart Medical Center undergoing an evaluation and was expected to remain there for an unknown period while DSHS assessed her prospects for future foster care.

Ms. C. admitted to past drug and alcohol abuse, but testified she had her problems under control. She was currently living in a drug and alcohol free environment, working as a maid, and assured Ms. West she was clean and sober. She entered an in-patient treatment program in December 1991 shortly after the children were removed and satisfactorily completed it. However, she did not begin attending an out-patient aftercare program until almost two years later, approximately one month before trial. She attended some AA meetings following her release from in-patient status, but stopped. She had just started attending meetings again and did not have a sponsor. She attended about 20 meetings over the preceding two years. Ms. C.'s willingness to follow her services plan ebbed and flowed as periodic review hearings were held. According to Ms. West, "we would get a flurry of activity prior to a hearing". Ms. C. underwent a psychological assessment in connection with her in-patient treatment and was diagnosed as substance dependent.

Ms. C. completed an anger management course, but admitted she was not cured and still occasionally lost her temper. This would seem confirmed by the fact she was convicted of fourth-degree assault while enrolled in the program when she struck her seven-year-old nephew. The incident arose when "My little nephew was in the back seat of the car calling me bitches and stuff and so I slapped him". This episode resulted in a period of incarceration which effectively terminated her anger management classes. She later completed the program. She was placed in the Treatment Alternatives to Street Crimes (TASC) program, but discharged on three separate occasions for noncompliance. Ms. C. was also offered mental health counseling, but a precondition of enrollment was participation in substance abuse aftercare. Because the condition was not met, counseling never occurred. Ms. West tried to place Ms. C. with the Department of Vocational Rehabilitation (DVR), but DVR felt she was unqualified for retraining because she lacked basic job skills. Ms. C. was offered individual parenting classes, participation in a day treatment center with J.A. and family counseling with all of the children. She did not complete the individual parenting classes. She conceded she missed most of the scheduled day-care sessions. Ms. C. participated in family counseling sessions, but these were halted because the children were not receiving any therapeutic value. Ms. C. candidly admitted her children had "problems".

Q: Would you agree, Miss [C.], that your children have problems?
A: Would I agree my kids have problems?
Q: Yes.
A: Yeah.
Q: What problems?
A: I mean due to what Gilbert has done to 'em, what I've done, the drug scene, what's happened, abuse that has happened in the past. Gilbert always hitting on 'em and everything. They've got a lot of

behavioral problems because they are, the way they've been treated — been hit a lot by Gilbert when he was around and I was afraid to do anything. He was always hittin' on me, too.

Q: Okay, and so what's the end result of these things that the children were exposed to? What problems do they have? What is their behavior as a result of that?

A: A lot of anger.

Q: Do they get violent?

A: They've got a lot of anger.

Gilbert was Ms. C.'s former boyfriend. He was physically and emotionally abusive to all the children, although J.D. was most frequently targeted. He and Ms. C. were using cocaine heavily at the time. Ms. C. agreed that her children were affected by witnessing the drug use. Gilbert had lived at the C. residence for about five years prior to the children's removal. Ms. C. told J.A. that Gilbert was her real father, not Albert. She continued to tell J.A. this even after the State investigated Gilbert in connection with possible paternity proceedings and excluded him as the biological father. Ms. C. did not believe the test results. J.A. felt alienated from her siblings because they taunted her about not being a "whole sister" and because all of the children associate Gilbert with violence and abuse. On two occasions, Ms. C. brought Gilbert with her to visitation sessions, although she had been directed not to do so by Ms. West because of his history of abuse.

Ms. C. no longer saw Gilbert or Alfred and was now seeing Manuel. Their precise relationship was unclear.

Q: And you still have a relationship with Manuel?

A: Yes, I do.

Q: Does he live at your house?

A: Yes.

Q: Oh, he lives at your house?

A: No.

According to Albert's testimony, Ms. C.'s first answer is the correct one. Manuel had an alcohol problem and continued to drink during his relationship with Ms. C. over the preceding two years, although he was then in an out-patient program. He too was abusive and had been arrested recently and charged with domestic violence for assaulting Ms. C. He was drunk at the time of the incident. Ms. C. was aware she was not supposed to have contact with people who used drugs or alcohol.

The testimony diverged sharply on Ms. C.'s relationship with her children. According to Ms. C., the supervised visitation sessions were joyous events. "The kids are happy; I'm happy when I get there when I see them. And they're happy. All they like to do, they like to play and do normal things that they did when they were home". According to Ms. West, the children acted out during and after visits which were often "chaotic". After these sessions, J.B. exhibited self-abusive behavior and scratched her face, kicked walls and so forth. J.D. responded best to these visits, but the girls were competitive and verbally abusive. J.C. flirted with Manuel, much to Ms. C.'s annoyance. J.A. engaged her mother in power struggles accompanied by name calling. Ms. C.'s response was to ask Ms. West "Can I leave?" Ms. West thought the visitation sessions remarkable because "usually when we get this far in a case plan we're able to move to unsupervised visits. We were never able to move to unsupervised visits because [Ms. C.] was never able to get to that point of managing these children — even for a short period of time". Ms. C.'s idea of discipline was to threaten the children that if they did not behave, "she was going to go out and get drunk or go out and get high". The children became upset upon hearing this. The visits were held three times per week, but over time, the children displayed increased post-visit misbehavior. Such behavior lasted two or three days, which meant they were perpetually in turmoil. Finally, the court reduced visits to one per month.

According to Albert, the children were angry, prone to violence, depressed and not getting any better in foster care. He could not control them and did not believe Ms. C. could either. He felt the children should remain in foster care.

Ms. C. was living with her mother and younger sister at the time of trial. Ms. West performed a home inspection shortly before. She found beer cans littering the yard. A wood stove abutted a wall with no insulating fireproof material in between. One bedroom contained a single bed. Ms. C. explained that if the children were returned to her, this bed would be shared by her sister and the three girls. The other bedroom would be shared by Ms. C. and J.D., who was then 11.

■ The facts are set out at length because they are compelling. With facts like this, one might think that surely the State has sustained its burden of showing parental unfitness by clear, cogent and convincing evidence. The problem which presents itself in this case is that appellate courts do not review facts to determine if the conclusions are supported. Rather, we review findings to determine if they are supported by substantial evidence. *In re Sego*, 82 Wn.2d 736, 743, 513 P.2d 831 (1973). If so, we then determine whether the conclusions flow from the findings. *Sego*, at 743. The only findings touching on the current fitness of Ms. C. are set out below:

> 1.10 Kathy [C.] lack's [*sic*] the ability to provide for the child's basic needs.

> 1.11 Kathy [C.] has not complied with aftercare recommendations made by drug and alcohol treatment providers and required by the service plan.

■■ Finding of fact 1.10 is not the sort of "sufficiently specific" finding required by the case law when the evidentiary standard is clear, cogent and convincing. *In re LaBelle*, 107 Wn.2d 196, 218, 728 P.2d 138 (1986) (findings "should at least be sufficient to indicate the factual bases

for the ultimate conclusions").[3] The finding states an ultimate fact, but not any underlying evidentiary facts. A court's oral ruling may be used to complement and explain written findings. *Ferree v. Doric Co.*, 62 Wn.2d 561, 566-67, 383 P.2d 900 (1963); *Shinn v. Thrust IV, Inc.*, 56 Wn. App. 827, 842, 786 P.2d 285, *review denied*, 114 Wn.2d 1023 (1990). The oral ruling does explain in greater detail and, with reference to the evidence, why Ms. C. lacks basic parenting skills, but even if finding of fact 1.10 could be saved by mentally reading into it the necessary predicate facts, finding of fact 1.11 is fatally flawed. The finding is sufficiently specific and amply supported by the evidence. However, it does not support conclusion of law 2.6 which reads "There is little likelihood that conditions will be remedied so that the child could be returned to either or both of [her/his] parents in the near future". The trial court's oral ruling comments as follows:

> Mr. Reynolds suggests that we have no reason to believe that you're currently using drugs. Well, you had the opportunity to prove that you weren't. I don't know whether you are or you aren't, but you had the opportunity to go to AA meetings, take UAs, complete your program.

The trial judge could not possibly have intended to shift the burden of proof to the parent. The case law placing the burden on the State is too well settled. *In re A.V.D.*, 62 Wn. App. 562, 568, 815 P.2d 277 (1991). Whether the court in fact shifted the burdens of both production and persuasion to Ms. C., the oral ruling certainly leaves that impression. What the trial judge must have meant is that Ms. C.'s past drug/alcohol use was so entrenched that absent compliance with the treatment program, there must be a presumption that the condition remains unchanged. That is exactly what the State now argues. The State contends that whether or not Ms. C. currently abuses is "off point" because "The issue at a termination

---

[3]"Although *LaBelle* is a mental illness case, the burden of production problem is the same as in a parental termination case, because in both types of cases, the burden of persuasion is clear, cogent and convincing evidence." *In re C.B.*, 61 Wn. App. 280, 284 n.3, 810 P.2d 518 (1991).

trial is not whether a parent 'abuses alcohol' but whether services have corrected parental deficiencies and whether the parent can best meet the needs of the child in the future".

 This is a disturbing premise which highlights the concern that the State "has the power to shape the historical events that form the basis for termination". *Santosky v. Kramer*, 455 U.S. 745, 763, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (1982). The services plan imposed here was reasonable, but there is no guaranty that good will and reason reign supreme throughout governmental bureaucracies. The State's position is another way of saying that the issue is not whether the parent is currently unfit, but whether the parent did what DSHS ordered him or her to do. That is not the law. Services plans are designed and services provided to assist a parent in correcting deficiencies. The wise parent in need of improvement will avail himself or herself of offered services. When a parent declines offered services, it may be probative of his or her prospects for rehabilitation. *See In re Welfare of S.V.B.*, 75 Wn.App. 762, 774, 880 P.2d 80 (1994). Standing alone, however, a refusal to comply with agency demands does not establish unfitness.

 A parent's past history is relevant in weighing present fitness. *In re Ross*, 45 Wn.2d 654, 657, 277 P.2d 335 (1954). However, the ultimate question is current parental fitness. *In re Moseley*, 34 Wn. App. 179, 186-87 & n.4, 660 P.2d 315, *review denied*, 99 Wn.2d 1018 (1983). At a termination trial, the State is essentially required to establish that dependency is continuing. *In re A.W.*, 53 Wn. App. 22, 28-29, 765 P.2d 307 (1988), *review denied*, 112 Wn.2d 1017 (1989). "The termination decision must be predicated upon present parental unfitness". *Krause v. Catholic Community Servs.*, 47 Wn. App. 734, 742, 737 P.2d 280, *review denied*, 108 Wn.2d 1035 (1987). This principle is bolstered by the 1993 amendments to RCW 13.34.180:

> A petition seeking termination of a parent and child relationship may be filed in juvenile court by any party to the

dependency proceedings concerning that child. Such petition shall conform to the requirements of RCW 13.34.040, shall be served upon the parties as provided in RCW 13.34.070(8), and shall allege:

. . . .

(5) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. In determining whether the conditions will be remedied the court may consider, but is not limited to, the following factors:

(a) Use of intoxicating or controlled substances so as to render the parent incapable of providing proper care for the child for extended periods of time and documented unwilling-ness of the parent to receive and complete treatment or documented multiple failed treatment attempts[.]

When the State relies on substance abuse to estab-lish RCW 13.34.180(5), the statute requires a showing of current use which renders the parent incapable of properly caring for the child for extended periods of time *and* refusal to be treated or multiple failed attempts at treatment. The court found only the second prong. As per RCW 13.34.180(5)(a), a failure to follow a services plan calling for substance abuse treatment may be evidence that deficiencies are unlikely to be corrected when coupled with a showing of current substance use. No case yet, however, has held that the failure to follow a services plan standing alone is evidence of current use.

There is nothing wrong with finding of fact 1.11. Ms. C. concedes she was aware of the requirement that she at-tend aftercare and failed to do so. Pursuant to RCW 13.34.180(5)(a), the State was also required to prove cur-rent use and that such use rendered Ms. C. incapable of caring for the children. This finding was not made, and even if it had been, it would not be supported by the evi-dence.[4] All the evidence would support is the court's oral ruling that "I don't know whether you are or aren't [cur-rently using]".

---

[4]Ms. C. admitted to having a drug/alcohol problem in 1991. That is why she entered in-patient treatment which she successfully completed. She claims to have been clean and sober since and not in need of aftercare. There is no direct

Reversed.

SWEENEY, A.C.J., and MUNSON, J., concur.

Review granted at 128 Wn.2d 1020 (1996).

---

evidence refuting this claim: no current evaluation, no evaluations at all for that matter other than reference to a 1992 evaluation not introduced into evidence, no eyewitness testimony of substance use, no expert testimony, and no evidence of substance related conduct. The only inferential evidence is that: (1) Ms. C. failed to participate in structured aftercare and attended AA meetings only sporadically, (2) she associated with a person who used alcohol, (3) Ms. West's hearsay testimony that a drug counselor from a treatment center thought Ms. C.'s home environment was not conducive to maintaining sobriety, and (4) Ms. West's testimony that she observed beer cans littering Ms. C.'s lawn. These features raise suspicions, but hardly satisfy the clear, cogent and convincing standard. This is a strong standard, and "the equivalent of saying that the ultimate fact in issue must be shown by evidence to be 'highly probable' ". *Sego,* 82 Wn.2d at 739.