IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of S.T.L., DOB: 07/30/2016 | No. 80087-6-I |
| | DIVISION ONE |
| STATE OF WASHINGTON, DEPARTMENT OF CHILDREN, YOUTH AND FAMILIES, | UNPUBLISHED OPINION |
| Respondent, | |
| v. | |
| SAMUEL NOAH, | |
| Appellant. | FILED: March 9, 2020 |

SMITH, J. — Samuel Noah appeals the termination of his parental rights to his daughter, S.T.L. Noah contends that the trial court violated his right to due process when it terminated his parental rights based in part on his failure to complete 30 days of court ordered urinalyses (UAs). He further contends that the Department of Children, Youth, and Families (Department) failed to provide the services necessary to correct his parental deficiencies, specifically, a parenting course independent from his visitation with S.T.L. We conclude that the Department provided constitutionally adequate notice that Noah's failure to complete UAs could be a basis for termination. We also conclude that substantial evidence in the record supports the court's finding that the Department provided all necessary services because an alternative service would not have corrected his parental deficiencies. Therefore, we affirm.

FACTS

Noah is the father to S.T.L, who was born in July 2016. S.T.L. has been in State custody her whole life and has never lived with her father.

In August 2016, the court adjudged S.T.L. dependent as to her mother.[1] In November 2016, Noah agreed to and the court entered an order of dependency as to Noah. Noah told the Department that "he [was] not living in a place that would be suitable for a newborn." The dispositional order noted that the Department was "concern[ed] with Mr. Noah's past DUI history," which involved three DUIs. Thus, the Department wanted "to rule out any alcohol issues with random UA testing." But "[a] drug/alcohol evaluation [was] a contested issue." The court ordered Noah to complete a drug and alcohol evaluation, UA testing for 30 days, an evidence-based parenting instruction program, and a parenting assessment with recommendations therefrom.

The Department assigned social worker Schawna Jones to Noah's case. On multiple occasions, Jones provided referrals for the services Noah was "ordered to participate in . . . to address the situations or problems that resulted in [S.T.L.] being placed in out of home care." The Services included, among other things, UAs, a drug and alcohol evaluation, and the "[p]articipation in and successful completion of an evidence-based parenting instruction program."

At the first dependency review in January 2017 and the permanency planning hearing in July 2017, the court found that Noah had "not visited [S.T.L.]

---

[1] The court later terminated the parental rights of S.T.L.'s mother. Ex 8 at 1; Ex 8 at 3. That termination is not at issue in this appeal.

on a regular basis" because he was "not always . . . reachable for visitation, . . . ended visitation early, and [did] not always appear[ ] for scheduled visitations." Thus, the court found that "Noah [had] not visited consistently enough to participate in parenting instruction/coaching with a Triple P provider." The court concluded that Noah did not make progress or comply with the court's order because of his lack of visits and failure to "engage[ ] in his UAs." Although the Department continued to recommend a drug and alcohol evaluation, the court did not order one. Between the January and July 2017 hearings, Jones sent two service letters to Noah noting his failure to attend visits and instructing Noah to begin UA testing. Jones also noted that parenting instruction would not begin until Noah visited S.T.L. regularly.

In November 2017, Noah met with Naomi Perry at Harborview Medical Center for his parenting assessment.[2] Perry testified that Noah said that "he would make the necessary adjustments" to care for S.T.L., but that she did not "get the impression that he was making the room to do that." Perry recommended "that [Noah] have a parent coach, and that he attend visits at least 80 percent of the time, and that he demonstrate basic competency and routinely incorporat[e] the coaching skills that he was given." And Perry testified that:

> [S.T.L.] is not going to be able to develop a relationship with [Noah]
> if he is sporadic. . . . [S]he may look at him as a stranger if he puts
> too much space between them. So what I know is that to be effective,

---

[2] Noah had been referred multiple times for parenting assessment because after previous referrals, "he hadn't followed through with . . . getting back in contact with the provider who was going to do the assessment." RP (May 20, 2019) at 37. Noah did not complete his parenting assessment until June 2018.

3

. . . they have to have constant contact together, and there needs to be a way for their relationship to grow in order for them to bond together.

In January 2018, the court conducted a second dependency review. It once again found that Noah's compliance and progress were only partial because of sporadic visitation and several missed UAs. The court also found that Noah failed to show for or cancelled visits, and that he now had "a visit provider," but he "ha[d] cancelled the first one or two visits."

In February 2018, Jones again sent a service letter to Noah explaining that he had missed UAs and needed to visit S.T.L. regularly. In May 2018, social worker Tahl Fox was assigned to Noah's case.

On June 22, 2018, the court modified the permanency plan. The court once again found that Noah only partially complied with court order because he had "not followed through with his court-ordered services of a substance abuse evaluation[ and] participation in an evidence based parenting program." The court therefore found that Noah had not made progress toward correcting the problems that necessitated S.T.L.'s out-of-home placement, because he "continues to lack parenting skills." The court found, however, that Noah had been visiting S.T.L. on a regular basis. Nonetheless, the court ordered adoption as the primary permanency plan for S.T.L.

In December 2018, at a third dependency review, the court found that Noah "only attended one visit despite offers of more visitation" and that he had neither complied with the court order nor made progress.

On July 1, 2019, nearly three years after dependency was initially ordered as to Noah, the Department petitioned for termination of Noah's parental rights. The petition repeated the Department's earlier concerns regarding Noah's DUI history and potential alcohol issues. The Department contended that "[t]hroughout the dependency the parents have demonstrated an unwillingness to participate in and/or successfully complete services offered to correct parental deficiencies." It asserted that Noah had "not made significant progress towards correcting the problems that necessitated the removal of the child," did "not follow[ ] through with the recommended treatment" from the parenting assessment, inconsistently visited S.T.L., and was "unable to engage in a Triple P Program."

Shelby Brown, a Court Appointed Special Advocate (CASA), later reported that:

> it is apparent that [Noah's] difficulty consistently attending and staying for the entirety of visits with his daughter were wasted opportunities to get to know her, to demonstrate to her that he is a stable adult figure in her life and contributed to an inability of the Department to put a parenting coach in place to assist him in gaining the skills necessary to be [S.T.L.]'s primary parent.

At trial, Brown testified that "no relationship was really being established." And she testified that she believed there would be harm if the court delayed termination any longer because it would "drag out the emotional distress for" S.T.L.

Noah failed to appear at many hearings leading up to the termination trial and then failed to appear for the trial. Noah's attorney contested termination on

Noah's behalf.

At the termination trial, the social worker Jones testified that Noah failed to participate in visitation in a consistent manner and that an identified deficiency included "concerns about alcohol use." She testified further that she and Noah discussed the UAs and that he said "he would let [her] know when he was ready to start UAs again." In describing Noah's visits with S.T.L., Jones testified that:

> [S.T.L.] would become distressed when he would come sometimes. . . . She would cry and get upset. Sometimes she would reach for me and wouldn't necessarily want to go to him. . . . He would voice his frustration or just was sort of upset, saying, you know, "She doesn't like me."

Despite twice-a-week, two-hour visitations scheduled by the court and that Jones attended, Jones only saw Noah nine or ten times during the nearly two years she was Noah's social worker. She testified that a visit provider "no longer provided visits for" Noah because he "missed three visits." When asked whether the Department was most concerned about the lack of relationship between Noah and S.T.L. and Noah's failure to "initiate[ ] a relationship with" S.T.L., Jones answered, Yes.

Social worker Fox testified that she supervised "[b]etween four and five visits" and "[t]he visits generally lasted somewhere between 15 and 35 minutes at most." Noah's visits were sporadic and S.T.L. "appeared very uncomfortable." She testified that, at one point, Noah came to her office seemingly under the influence of alcohol. Specifically, "[h]is eyes were really bloodshot, and [she thought she] smelled [alcohol] on him." Both Fox and Jones testified that they

6

were unable to provide a referral for parenting instruction because of the inconsistency of Noah's visits.

On May 23, 2019, the court found, with regard to the UAs, that Noah "participated in an on and off manner with urinalysis and demonstrated he knew how to participate in this service[, and that r]esults for his urinalysis samples were all negative but he never completed 30 days consecutively as required by the court order." The trial court found further:

> v.   Despite visitation not being a service the Department continually recommended the father participate in visitation and offered the father visitation with the intent of being able to refer [him] to Triple P when he demonstrated consistency which he never did. [sic] The father repeatedly lost visitation contracts and when this occurred the assigned social workers offered visitation. The father regularly attended for less than the allotted length of visitation, expressing the need to do other things such as going to the library or to Ross or to work.
>
> vi.  The father never demonstrated interest or pursued participation in the Department's recommended services of a drug alcohol evaluation nor a mental health assessment.
>
> vii. The father never asked for any additional services and the court never found the Department failed to make reasonable efforts in this case.

The court found that there was "little likelihood that conditions will be remedied" because, among other things, the "[p]lacement of the child with this father poses significant risk due to the lack of relationship and the risk of his inconsistent behavior."

The court concluded that "[t]ermination of the parent-child relationship between [S.T.L.] and . . . Noah is in the child's best interest," that Noah is unfit to parent S.T.L., and that the findings of fact were proven by "clear, cogent, and

convincing evidence." The court therefore granted the Department's petition and terminated Noah's parental rights. Noah appeals.

ANALYSIS

Due Process

Noah contends that the court violated his due process rights by terminating his parental rights in part on the basis of his failure to complete 30 days of UA testing when the Department had not given him notice that such failure could lead to the termination of his parental rights. We disagree.

As an initial matter, the Department contends that because Noah did not object to the testimony at trial regarding his failure to complete the 30 days of UAs, he has not preserved the error for appeal. However, the Department's failure to notify a parent that a particular parental deficiency could be a basis for termination is a "manifest error affecting a constitutional right," which may be raised for the first time on appeal. RAP 2.5(a); In re Dependency of A.M.M., 182 Wn. App. 776, 789 n.8, 332 P.3d 500 (2014). The Department also contends that the trial court did not actually rely on Noah's failure to complete UAs. Contrary to the Department's contentions, the court did rely on Noah's failure to complete UAs in its termination order by expressly referring to Noah's "failure to engage in random UAs for the time period ordered by the Court" and "incorporat[ing] [into its order] its oral ruling" that Noah's parental deficiencies included his failure to complete the UAs. Therefore, we address the merits of Noah's due process argument.

To that end, "'[t]he due process clause of the Fourteenth Amendment protects a parent's right to the custody, care, and companionship of [their] children.'" In re Welfare of K.K., 119 Wn.2d 600, 609, 836 P.2d 200 (1992). "That right cannot be abridged without due process of law." K.K., 119 Wn.2d at 609. Due process requires that parents receive "[n]otice, open testimony, time to prepare and respond to charges, and a meaningful hearing before a competent tribunal in an orderly proceeding." In re Moseley, 34 Wn. App. 179, 184, 660 P.2d 315 (1983). The purpose of notifying the parents of the specific issues to be considered is "to prevent surprise, helplessness and disadvantage." In re Welfare of Martin, 3 Wn. App. 405, 410, 476 P.2d 134 (1970). We review de novo an alleged deprivation of due process. In re Welfare of A.G., 160 Wn. App. 841, 844, 248 P.3d 611 (2011).

Here, Noah was given adequate notice that his failure to complete the court-ordered UAs could be a basis for termination. Specifically, the dispositional order expressly required Noah to complete 30 days of UAs to dispel the Department's concern regarding alcohol abuse. The dependency review orders in January 2017 and January 2018 and the permanency planning orders from July 2017 and June 2018 found Noah noncompliant with the court's order because he did not complete his UA requirements and found that "[p]rogress toward correcting the problems that necessitated the child's placement in out-of-home care" had not been made because Noah had "not yet engaged in his UAs." The Department's pretrial statement of evidence listed the Department's proposed exhibits, including a "[s]ummary of UA collections reflecting

attended/missed UA's." Additionally, the termination petition and the Department's trial memorandum referenced Noah's failure to participate in UA testing. Thus, the court did not violate Noah's due process rights.

Noah disagrees and relies on A.M.M. for the contention that he was deprived of his due process right to notice. In A.M.M., the Department petitioned to terminate the parental rights of the dependents' mother, Knopff. 182 Wn. App. at 784. "At the termination hearing, a social worker testified that one of Knopff's parental deficiencies was that she lacked understanding of her children's developmental needs." A.M.M., 182 Wn. App. at 784. The trial court agreed and terminated the relationship based on three deficiencies including the mother's "lack of knowledge regarding her children's development needs." A.M.M., 182 Wn. App. at 792. We concluded that termination on that basis was a violation of Knopff's due process rights because:

> Neither the termination petition nor the dependency petition stated that Knopff's lack of knowledge regarding her children's developmental needs constituted a parental deficiency. Moreover, . . . there is no evidence in the record that Knopff was ever informed that she could lose her parental rights if she did not adequately familiarize herself with her children's developmental needs.

A.M.M., 182 Wn. App. at 792. Accordingly, we reversed the termination.

A.M.M., 182 Wn. App. at 794. But here, unlike in A.M.M, both the termination petition and Noah's disposition noted and highlighted the requirement that Noah complete his UAs to dispel concerns of alcohol abuse. Thus, Noah's reliance on A.M.M. is misplaced.

10

Services

Noah contends that the Department failed to offer and provide the services necessary under RCW 13.34.180(1)(d) to correct his parental deficiencies. Specifically, he contends that if the Department had offered him parenting instruction outside of visitation with S.T.L., "reunification in the near future was possible if not probable." We disagree.

Before the trial court may terminate a parental relationship, "the Department must satisfy a two-step test." A.M.M., 182 Wn. App. at 784. First, "the Department must show that it has satisfied its statutory obligations pursuant to RCW 13.34.180(1)." In re Parental Rights to K.M.M., 186 Wn.2d 466, 478, 379 P.3d 75 (2016). As relevant here, the Department must prove by clear, cogent, and convincing evidence "[t]hat the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1). The services offered must be tailored to the parent's individual needs. In re Dependency of P.D., 58 Wn. App. 18, 29, 792 P.2d 159 (1990). But, "'[w]here the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services.'" K.M.M., 186 Wn.2d at 483 (quoting In re Welfare of C.S., 168 Wn.2d 51, 56 n.2, 225 P.3d 953 (2010)). The second step requires the Department to "establish that termination of parental rights would be in the child's best interests." K.M.M., 186 Wn.2d at 478.

11

"Where the trial court has weighed the evidence, review is limited to ascertaining whether the findings of fact are supported by substantial evidence, and if so, whether the findings support the conclusions of law and the judgment." P.D., 58 Wn. App. at 25. And "[b]ecause of the highly fact-specific nature of termination proceedings, deference to the trial court is 'particularly important.'" K.M.M., 186 Wn.2d at 477 (quoting In re Welfare of Hall, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983)).

Here, Noah assigns error to Finding of Fact 2.12(d) and Finding of Fact 2.13. In Finding 2.12(d), the court found that "[s]ervices ordered under RCW 13.34.130 have been expressly and understandably offered or provided and all necessary services reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." In Finding 2.13, "[t]he court [made] an explicit finding that the father remains currently unfit to parent this child for the reasons described above," including the findings in 2.12(d). Because the record establishes that the offer of additional or different services would be futile, Noah's challenges to these findings fail.

Specifically, Noah does not assign error to the court's other findings, and they are verities on appeal. See State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489, 494 (2003) (holding that where a trial court's "findings are unchallenged, they are verities on appeal"). To that end, the court found:

> [Noah] never developed a relationship with the child and his visitation was so sporadic as to prevent the offer of parenting coaching services. This service would have been futile as there was no

suggestion by any party that the father had the initiative or the interest to parent this child.

The court also found that "[a]ll the witnesses noted that the father showed no initiative and no relationship with his child" and that "[c]ontinuation of the parent-child relationship between [S.T.L.] and [Noah] clearly diminishes the child's prospects for early integration into a stable and permanent home."

Furthermore, the social workers and service providers consistently testified at trial that Noah's failure to show up to visitation dependably "could have devastating effects on [S.T.L.'s] psychological, emotional, and physical well-being." Noah's inconsistency was highlighted throughout the termination hearing. And Jones testified that Noah "hadn't made progress in the things that [the Department was] concerned about and hadn't developed a relationship with [S.T.L.]" Fox testified that Noah "did say that he would like to parent . . . at times; but then there were other times where he would say that . . . she was fine where she was." Jones and Fox testified that they spoke with Noah about the importance of consistency and the court-ordered UA requirement. And neither social worker was able to refer Noah to parent instruction services because of his lack of consistency. In short, the record establishes that the offer of additional or different services would be futile because Noah could not take advantage of the services already offered. Thus, the trial court's finding that the Department offered all necessary services is supported by substantial evidence.

Noah disagrees and contends that the Department failed to provide the right *kind* of service, i.e. parenting instruction without the presence of S.T.L. But "'a parent's unwillingness or inability to make use of the services [already]

13

provided excuses the State from offering extra services that might have been helpful.'" K.M.M., 186 Wn.2d at 485 (quoting In re Dependency of Ramquist, 52 Wn. App. 854, 861, 765 P.2d 30 (1988)). And while the testimony at trial showed that Noah grew frustrated and upset at visitation, which could have been a reason for his failure to attend visits consistently, the record also indicates that Noah lacked the initiative and the commitment to parenting S.T.L. required to take advantage of any service, let alone a different one. Noah could not consistently make it to visitation with S.T.L., he failed to stay for the full duration of the visits, he demonstrated a lack of initiative to engage with S.T.L. and the process, including failing to appear at the termination hearing and not returning his social workers' calls, and he failed to comply with the court ordered UAs. Thus, Noah's unwillingness to take advantage of the services provided excused the Department from offering a different service that may have been more useful to Noah,.

Noah next asserts that because the Department did not offer all necessary services, the court's finding that termination was in the best interests of S.T.L. was premature. But because we conclude that the Department *did* offer all necessary services and Noah does not make any substantive arguments against the best interests finding beyond the Department's alleged failure to provide services, we disagree.

## Unfitness

As a final matter, Noah contends that the Department did not prove any nexus between failure to complete random UAs and parental unfitness and that

the court cannot base termination "solely on a parent's noncompliance with an alcohol-related condition." As to the first contention, there exists a nexus between Noah's failure to complete random UAs and his unfitness because the former supports the court's determination that Noah lacked the initiative, the commitment, and the consistency necessary to provide S.T.L. with "basic nurture, health, or safety." In re Welfare of A.B., 181 Wn. App. 45, 61, 323 P.3d 1062 (2014). And the UAs, as noted in many of the court's orders, were required to address a problem that necessitated S.T.L.'s placement in out-of-home care. As to the second contention, the court did not base termination solely on Noah's noncompliance with the UA requirement. Instead, the court looked at numerous facts including (1) Fox's testimony that Noah showed up to her office smelling of alcohol and (2) the court's determination that "[p]lacement of [S.T.L.] with [Noah] pose[d a] significant risk due to the lack of relationship and the risk of his inconsistent behavior." For the foregoing reasons, we conclude that there was substantial evidence that Noah was unfit to parent.

We affirm.

_____
Smith, J.

WE CONCUR:

_____
Leach, J.

_____
Dwyer, J.

15