IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to | ) | No. 35902-6-III |
| | ) | (consolidated with |
| J.L.A.C.M. and H.A.M.M.† | ) | No. 35903-4-III) |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

LAWRENCE-BERREY, C.J. — James McCarthy appeals the termination of his

parental rights to J.L.A.C.M. (J.C.M.) and H.A.M.M. (H.M.). He asserts the State did not

prove that "all necessary services, reasonably available, capable of correcting the parental

deficiencies within the foreseeable future" were offered or provided to him. Specifically,

he argues the services were not tailored to meet his specific needs, he was not offered

disability services, and he was not offered anger management treatment. Mr. McCarthy

also alleges he received ineffective assistance of counsel when his trial counsel failed to

object to hearsay testimony that he did not complete chemical dependency treatment.

Finding no error, we affirm.

---

† We have changed the case title in accordance with an amendment to RAP 3.4 and the General Order for the Court of Appeals, *In Re Changes to Case Title* (Wash. Ct. App. 2018), both effective September 1, 2018.

FACTS

On July 11, 2014, the Department of Social and Health Services (Department) received an allegation that the home in which one-year-old J.C.M. and two-year-old H.M. were living was unsanitary. After receiving Mr. McCarthy's permission, Child Protective Services (CPS) social worker James Hatley entered the home. Mr. Hatley described the home as "very cluttered, unsanitary" with "garbage and food throughout, dirty laundry, moldy dishes." Report of Proceedings (RP) at 56. Garbage was "[l]ayered throughout the house, almost in every area to the point where you were almost wading through it." RP at 56. H.M. was "walking around the house eating out of a trash can or a pile of garbage" while J.C.M. was "in the parents' room in a bassinet crying and reaching out to me to hold him." RP at 65. The children were dirty, as it was clear they had not been bathed in some time, with food on their face and dirt on their extremities. J.C.M. had a rash in his groin area. Mr. McCarthy's children were removed and placed into protective custody.

After the two children were taken into protective custody, Mr. McCarthy agreed that they were dependent. The dispositional order required Mr. McCarthy to: (1) submit to random urinalysis (UA) tests, (2) participate in a drug and alcohol assessment and its treatment recommendations, (3) acquire and maintain appropriate housing, (4) sign

releases of information, (5) participate in a psychological evaluation, and (6) participate in parent education to learn new parenting techniques.

      1.      Chemical Dependency Services and Drug Testing

The Department referred Mr. McCarthy to Serenity Point for UAs and chemical dependency treatment. This was an initial focal point because Mr. McCarthy stated he would use so much marijuana that he would be unable to care for his children.

Serenity Point recommended intensive outpatient treatment only after Mr. McCarthy obtained medical marijuana by a pill form with a doctor's oversight. To the Department's knowledge, Mr. McCarthy never obtained medical marijuana in a pill form with a doctor's oversight. Despite this, Mr. McCarthy began intensive outpatient treatment in June 2015. The treatment required him to attend three weekly three-hour group sessions and a 12-step support group.

Mr. McCarthy struggled with the requirement that he provide random UAs. Mr. McCarthy provided UAs during September and October 2014. He did not provide any UAs from November 2014 through January 2015. He began providing UAs in February 2015, but stopped in March 2015. He then provided UAs consistently from late April through July 2015.

Mr. McCarthy's parental rights to his two children were first terminated on July 12, 2016. In October 2015, the Department received reports that Mr. McCarthy was missing group sessions, was refusing to provide UAs, and would be discharged for noncompliance. The social worker testified that Mr. McCarthy failed to complete intensive outpatient services.

By agreement of the parties, the termination orders were reversed on December 2, 2016, and the matter was remanded for a new termination trial. Mr. McCarthy's subsequent termination trial occurred on January 31 and February 1, 2018. He failed to provide any UAs between the initial trial and the subsequent trial.

2. Housing

In April 2015, Mr. McCarthy secured an apartment through a local program that helps convicted felons obtain housing. One of the program's requirements is that the tenant submit to random drug testing. In October 2015, Mr. McCarthy vacated the apartment.

3. Psychological Evaluation

The Department referred Mr. McCarthy for a psychological evaluation. Dr. Ronald Page evaluated Mr. McCarthy in 2003, 2008, and again on November 5, 2014. In 2008, Dr. Page diagnosed Mr. McCarthy with polysubstance abuse, cannabis dependence,

4

and antisocial personality disorder. In 2014, Dr. Page diagnosed Mr. McCarthy with cannabis use disorder, polysubstance dependence, antisocial personality disorder, and mild mental retardation.[1] Dr. Page opined, "[i]n my opinion, the greatest mismanagement of this man's rehabilitation program would be to start at any point other than a focus on chemical dependency and an expectation of abstinence, monitored." Ex. 2 at 8. He further elaborated that it is an addiction for Mr. McCarthy, it's not recreational, and "until he could be abstinent of everything, then his behavior and his life course, his stability would not change." RP at 33-34. Dr. Page believed that attempting mental health treatment on patients with antisocial personality disorder actually makes them worse.

During cross-examination, Dr. Page testified that Mr. McCarthy discussed anger management treatment with him. Dr. Page described anger management treatment as potentially "helpful" for Mr. McCarthy. RP at 51.

Mr. McCarthy requested the Department to provide him anger management services. But the Department did not assess this service as being necessary nor was it ordered. The social worker "felt pretty strongly that [Mr. McCarthy] had chemical

---

[1] Dr. Page calculated Mr. McCarthy's IQ (intelligence quotient) at 67. Dr. Page cautioned that Mr. McCarthy's poor performance "undoubtedly was encumbered by the ongoing history of active heavy cannabis use, including probable partial intoxication even during administration of the instrument. Given one month's abstinence, this man's performance very well might be improved significantly." Ex. 2 at 6; *see also* RP at 45.

dependency issues that overshadowed" any potential anger management issues, and he needed to establish sobriety "in order to assess what was really going on underneath." RP at 109. During the summer of 2015, Mr. McCarthy established a period of sobriety. "[D]uring that time he was a little bit easier to get along with. He did not have those outbursts." RP at 109.

    4.    Parenting Education

The Department referred Mr. McCarthy for parenting services on October 28, 2014. Mr. McCarthy was assigned to Nancy Riggle, a parenting educator who contracts with the Department. Ms. Riggle specialized in assisting people with developmental disabilities. As part of the formal assessment, Ms. Riggle and Mr. McCarthy discussed goals for him. Because Ms. Riggle knew from the referral that he was developmentally disabled, she brought up Developmental Disabilities Administration (DDA) services. Ms. Riggle testified, "we did discuss about developmental disabilities services. He wasn't too open with it. He said he didn't need it, was willing to look into it, but that's something we did try to get him involved with." RP at 139. Ms. Riggle spoke with Mr. McCarthy about DDA services on several occasions, but "[h]e was not very positive about having developmental disabilities services." RP at 163.

Visitation was initially scheduled for two visits per week, two hours per visit. In December 2014, each visit was increased to four hours because Mr. McCarthy was marginally participating, he had a positive interaction with the children, and he had requested more time. Ms. Riggle monitored some sessions; however, Mr. McCarthy did not follow or participate in Ms. Riggle's parenting instructions.

For instance, Ms. Riggle attempted to have Mr. McCarthy read to his children to improve their communication skills. Because their skills were not well developed, there was a lot of screaming instead of using words. Ms. Riggle believed that if Mr. McCarthy would read to his children, it would help engage them and develop good rapport with them. Ms. Riggle assessed Mr. McCarthy's reading level as third grade and attempted to have Mr. McCarthy read children's books to his children. Ms. Riggle told him she "didn't care if he even read the words . . . [she] just wanted him to have that interaction and for the children to develop some skills because of it." RP at 144. She worked with him on interactive reading and modeled it for two weeks because he refused to do it.

Ms. Riggle provided 16 one-on-one meetings and offered 19 visitation/parenting services with the children. After the referral expired in June 2015, Ms. Riggle did not recommend obtaining another referral because Mr. McCarthy resisted doing what she

asked him to do. Nonetheless, in July 2015, the Department increased his visitation to three times per week for two to six hours per visit.

Visits at Mr. McCarthy's apartment were largely supervised by visitation specialist Barbara Coble, who supervised approximately 30 such visits. During these visits, Ms. Coble had many safety concerns. The children would jump on the tables, jump on the couches, were left unattended, walked unattended up concrete stairs, and Mr. McCarthy often would fall asleep. Ms. Coble testified that she witnessed Mr. McCarthy sleeping during 20 to 30 times during these visits. Ms. Coble terminated more than 10 visits because of noncompliance with directions. On one occasion, J.C.M. walked out of the home, unnoticed by Mr. McCarthy. Because of these safety concerns, the visits were reduced and moved back to the Department.

The Department sent another referral to Ms. Riggle on September 14, 2015. Ms. Riggle set up six different appointments with Mr. McCarthy and he failed to show for all of them.

The Department attempted to re-engage Mr. McCarthy, but it was difficult. His phone was not set up to receive voicemail messages, there was no address listed in the welfare system, and there was no forwarding address after he moved out of his studio apartment. In late 2016, Mr. McCarthy heard that the Department would agree to

reverse the termination orders and contacted the Department. His social worker answered the phone and explained that the orders were reversed and that she needed his contact information. Mr. McCarthy cursed at the social worker, asked for a new social worker, and refused to provide a telephone number where he could be reached.

In March 2017, Mr. McCarthy's social worker learned that he had been arrested and was in jail on a charge of possession of methamphetamine. The social worker visited Mr. McCarthy at the jail and provided him an updated court report with recommended services. She explained the termination orders had been reversed, that he still had parental rights, and made sure he had contact information for his attorney.

Later that month, Mr. McCarthy pleaded guilty to possession of methamphetamine. He was sentenced to 12 months of community custody. One result of his conviction was the requirement that he obtain a chemical dependency evaluation within 30 days and complete all program requirements. Mr. McCarthy repeatedly tested positive for marijuana. In July 2017, he had his judgment and sentence amended to permit him to use marijuana for pain and personal issues.

Mr. McCarthy failed to appear at either of his termination trials. The subsequent termination trial occurred on January 31 and February 1, 2018. The trial court considered the evidence and terminated Mr. McCarthy's parental rights to J.C.M. and H.M.

Mr. McCarthy now appeals.

## ANALYSIS

A.    THE DEPARTMENT PRESENTED SUFFICIENT EVIDENCE THAT IT EXPRESSLY AND UNDERSTANDABLY OFFERED ALL NECESSARY SERVICES, REASONABLY AVAILABLE

Mr. McCarthy alleges that the State failed to prove statutory element RCW 13.34.180(1)(d) by clear, cogent, and convincing evidence. His argument is three-fold: (1) the Department failed to tailor the services to Mr. McCarthy's specific necessities, (2) the Department did not offer him services through the DDA as required, and (3) the Department failed to provide him anger management treatment.

Parents have a fundamental liberty interest in the care, custody, and companionship of their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (plurality opinion). To deprive a parent of this fundamental right is a two-step process. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). First, the Department must prove six termination factors set forth in RCW 13.34.180(1) by clear, cogent, and convincing evidence. *Id.* If that is satisfied, the court then determines whether, by a preponderance of the evidence, termination is in the best interests of the child. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 576-77, 257 P.3d

522 (2011). The trial court is afforded great deference on review. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999).

This court reviews a trial court's decision on any of the six termination factors for substantial evidence. *In re Parental Rights to B.P.*, 186 Wn.2d 292, 313, 376 P.3d 350 (2016); *In re Parental Rights to I.M.-M*, 196 Wn. App. 914, 921, 385 P.3d 268 (2016). The trial court's findings "must be upheld if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence." *In re Welfare of M.R.H.*, 145 Wn. App. 10, 24, 188 P.3d 510 (2008). Clear, cogent, and convincing evidence means "highly probable." *Id.*

The only termination factor challenged on appeal is that the Department failed to offer or provide Mr. McCarthy with "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." RCW 13.34.180(1)(d). "A service is 'necessary' if it is needed to address a condition that precludes reunification of the parent and child." *I.M.-M.*, 196 Wn. App. at 921 (citing *In re Welfare of C.S.*, 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010)). The service must be tailored to the individual's needs. *Id.*

"'Where the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services.'" *C.S.*,

168 Wn.2d at 56 n.2 (quoting *M.R.H.*, 145 Wn. App. at 25). "The provision of services is futile where a parent is unwilling or unable to participate in a reasonably available service that has been offered or provided." *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 483, 379 P.3d 75 (2016).

> 1. Tailoring of services

Mr. McCarthy argues that services were not tailored to fit his specific needs. We disagree. At every stage, the Department focused on his specific needs.

The Department referred Mr. McCarthy to Dr. Page for a psychological evaluation. According to the evaluation, Mr. McCarthy's primary obstacle was his addiction to marijuana. Dr. Page opined, "the greatest mismanagement of this man's rehabilitation program would be to start at any point other than a focus on chemical dependency and an expectation of abstinence, monitored." Ex. 2 at 8. For this reason, the Department's primary focus was on obtaining treatment for Mr. McCarthy's marijuana addiction.

Mr. McCarthy argues that Ms. Riggle was uninformed of his deficits and failed to structure parenting services in an appropriate manner. We disagree. The evidence establishes that Ms. Riggle was well aware of Mr. McCarthy's deficits, had significant experience and training working with people with similar deficits, and structured parenting services appropriately. Specifically, Ms. Riggle assessed Mr. McCarthy's

reading level as third grade and chose children's books for him to read to his children. She even said that he did not have to read the words as long as he interacted with his children using the books. She spent two weeks patterning this simple skill with him and his children, yet he refused to follow her instructions. She also sought to have him play with his children. His deficits did not prevent him from playing with his children. Yet, he refused and elected to sleep during most of his visits.

### 2. Offering of DDA services

Mr. McCarthy also argues he was not offered or provided DDA services. We disagree.

RCW 13.34.136(2)(b)(i)(B) provides:

> If a parent has a developmental disability according to the definition provided in RCW 71A.10.020, and that individual is eligible for services provided by the department of social and health services developmental disabilities administration, the department shall make reasonable efforts to consult with the department of social and health services developmental disabilities administration to create an appropriate plan for services.

"'Developmental disability' means a disability attributable to intellectual disability, cerebral palsy, epilepsy, autism, or another neurological or other condition . . . which constitutes a substantial limitation to the individual." RCW 71A.10.020(5).

First, Mr. McCarthy has not shown that he has a disability that constitutes a "substantial limitation" to him under RCW 71A.10.020(5). Dr. Page attributed Mr.

13

McCarthy's poor IQ test performance to his long-term use of marijuana and thought that

Mr. McCarthy was possibly under the effects of marijuana during the examination. Dr.

Page also believed that if Mr. McCarthy abstained from marijuana for a month, his testing

might be improved significantly.

Second, the Department offered Mr. McCarthy DDA services. Ms. Riggle

testified, "[S]o we did discuss about developmental disabilities services. He wasn't too

open with it. He said he didn't need it, was willing to look into it, but that's something

we did try to get him involved with." RP at 139. Ms. Riggle spoke with Mr. McCarthy

about DDA services on several occasions, but "[h]e was not very positive about having

developmental disabilities services." RP at 163. The evidence is clear: DDA services

were offered to Mr. McCarthy, but he refused them.

### 3. Anger management treatment

Mr. McCarthy argues he was not provided anger management treatment. Under

RCW 13.34.180(1)(d), the Department must establish that "all necessary services,

reasonably available, capable of correcting the parental deficiencies within the

foreseeable future have been expressly and understandably offered or provided."

First, there is no evidence that anger management treatment was a necessary

service. Dr. Page testified on cross-examination that Mr. McCarthy asked about anger

14

management treatment. Dr. Page testified that anger management treatment would have been potentially "helpful" to Mr. McCarthy. RP at 51. He did not testify that the treatment was necessary.

Second, there is no evidence (or allegation) that Mr. McCarthy had an anger issue that contributed to his parental deficiencies. Although Dr. Page believed anger management treatment would have been potentially helpful for Mr. McCarthy, the record is unclear what Dr. Page meant. Dr. Page could have meant that anger management treatment would have been potentially helpful for Mr. McCarthy *as a person*, as opposed to helpful for remedying his parental deficiencies.

In the absence of any evidence that anger management was reasonably necessary for correcting Mr. McCarthy's *parental deficiencies*, the Department had no obligation to provide the service.

B.     INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. McCarthy argues that he received ineffective assistance of counsel when trial counsel failed to object to hearsay testimony that he did not complete chemical dependency treatment.

An ineffective assistance of counsel claim can be raised for the first time on appeal. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). This court reviews

such claims de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

Parents are guaranteed the right to counsel in dependency and termination cases.

RCW 13.34.090(2). However, Washington courts have applied two standards—

*Strickland*[2] and *Moseley*[3]—to allegations of ineffective assistance of counsel claims in

dependency and termination actions.[4] Because Mr. McCarthy's claim fails under either

standard, we express no opinion as to which standard is proper.

 *Strickland* commands a heightened level of judicial review, compared to *Moseley*.

Applying the heightened *Strickland* standard, an appellant must establish both prongs of

the following test: (1) was counsel's performance deficient, and (2) if so, did counsel's

deficient performance prejudice the defendant to an extent that changed the result of the

trial. *Strickland*, 466 U.S. at 687. We can address the second prong initially "[i]f it is

---

[2] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[3] *In re Moseley*, 34 Wn. App. 179, 660 P.2d 315 (1983).

[4] This court has acknowledged the two different standards but has not adopted one in a published opinion. *See, e.g.*, *In re Welfare of A.K.J.M.W.*, No. 32084-7-III, No. 32089-8-III, slip op. at *9 (Wash. Ct. App. Apr. 23, 2015 (unpublished), http://www.courts.wa.gov/opinions/pdf/320847.unp.pdf (recognizing that Division One adopted the *Strickland* test and adhering to that approach); *but see In re Dependency of I.W.*, No. 33786-3-III, slip op. at *3 (Wash. Ct. App. Feb. 21, 2017) (unpublished), http://www.courts.wa.gov/opinions/pdf/337863_unp.pdf (not definitively applying either standard); *In re Parental Rights to M.S.*, No. 34105-4-III, No. 34106-2-III, slip op. at *1 n.2 (Wash. Ct. App. Jan. 3, 2017) (unpublished), http://www.courts.wa.gov/opinions/pdf/341054_unp.pdf (recognizing the *Moseley* test

easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice." *Id.* at 697.

The prejudice prong requires the appellant to show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. The appellant must show that without the errors of counsel, there is a "reasonable probability" that the result of the proceeding would have been different. *Id.* at 694. "Reasonable probability" is "probability sufficient to undermine confidence in the outcome." *Id.*

Mr. McCarthy argues that the social worker's hearsay testimony was the only evidence that he failed to complete chemical dependency treatment. He further argues, had trial counsel objected to this testimony, there would have been insufficient evidence to sustain this finding. We disagree.

Here, the trial court admitted several orders it had previously entered. These orders established that Mr. McCarthy was generally noncompliant with his court-ordered drug testing and chemical treatment requirements. In addition to those orders, Mr. McCarthy was arrested for possession of methamphetamine in March 2017. He pleaded guilty later that month and was required to submit to random drug testing. He repeatedly

but labeling the difference between the two tests "immaterial.").

17

tested positive for marijuana. In July 2017, he had his sentence amended to permit him to use marijuana.

The central purpose of Mr. McCarthy's chemical treatment was for him to overcome his chronic addiction to marijuana so he could parent his two children. There is ample evidence that Mr. McCarthy failed in this goal. Had defense counsel objected to the social worker's hearsay testimony, the trial court still had substantial evidence to support the Department's more central assertion: Mr. McCarthy's continued addiction to marijuana rendered him unable to parent his children. We conclude that Mr. McCarthy was not prejudiced by his trial counsel's failure to object to the social worker's hearsay testimony.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Siddoway, J.

18